WASTE MANAGEMENT OF CAROLINAS, INC., T/D/B/A TRASH REMOVAL SERVICE, INC. v. PEERLESS INSURANCE COMPANY AND PENNSYL-VANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY

No. 70PA85

(Filed 18 February 1986)

Insurance § 149— liability insurance—leaching of contaminants into groundwater as occurrence—coverage excluded by pollution exclusion clause

Where plaintiff trash collector intentionally dumped waste materials onto a landfill over a period of years, the unintended and unexpected leaching of contaminants from the waste materials into the groundwater beneath the land-fill was accidental and thus an "occurrence" within the meaning of liability policies issued to plaintiff. However, the alleged occurrence was excluded from coverage by a pollution exclusion clause which excluded damage caused by the release, escape, discharge or dispersal of pollutants or contaminants that is not "sudden and accidental" where plaintiff alleged facts describing the contribu-tion over a number of years of contaminating materials to the landfill which eventually rendered groundwater beneath it unfit for human consumption, and there was no express or implied allegation of a "sudden" release or escape of contaminants. Therefore, defendant insurers are under no obligation to defend plaintiff in federal actions concerning contamination of the aquifer by the leaching of waste materials from the landfill.

ON defendants' petition for discretionary review of the deci-sion of the Court of Appeals, 72 N.C. App. 80, 323 S.E. 2d 726 (1984), reversing in part and affirming in part judgment entered by *Fountain, J.,* at the 12 September 1983 session of Superior Court, NEW HANOVER County. Heard in the Supreme Court 21 November 1985.

*Burney, Burney, Barefoot, Bain & Crouch, by Auley M. Crouch III, and Hinshaw, Culbertson, Moelmann, Hoban & Fuller, by D. Kendall Griffith, William J. Holloway, and Joanna C. New, for plaintiff appellee.*

*Young, Moore, Henderson & Alvis, P.A., by Walter E. Brock, Jr., for Pennsylvania National Mutual Casualty Insurance Com-*

*pany, and Prickett & Corpening, by Carlton S. Prickett, Jr., for Peerless Insurance Company, defendant appellants.*

*Bailey, Dixon, Wooten, McDonald, Fountain & Walker, by J. Ruffin Bailey and Gary S. Parsons, for American Insurance Association and Alliance of American Insurers, amici curiae.*

*John C. Russell for Eugene R. Anderson, amicus curiae.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by John Sarratt, and Mendes & Mount, by John G. McAndrews and Henry Lee, for George Haycroft Milton and Underwriters at Lloyd's, London, amici curiae.*

MARTIN, Justice.

On 11 January 1980, the United States of America filed an action against Waste Industries and others, including the owners, operators, and the franchisor of the Flemington landfill in New Hanover County, alleging that waste material disposed of on that landfill had leached into and contaminated groundwater beneath it, rendering the well water in several surrounding households hazardous for human consumption.[1] The suit, based upon section 7003 of the Resource Conservation and Recovery Act, sought injunctive and monetary relief.

The owners and operators of the landfill and the county, its franchisor, filed third-party complaints against Trash Removal Services, Inc. (TRS), among others, seeking indemnity for or contribution to whatever liability they incurred in the federal suit. The three third-party complaints alleged that, in delivering quantities of solid waste materials to the landfill, TRS had represented that the material was not hazardous or contaminated. The complaints also alleged that if the allegations in the federal suit proved to be true, TRS had been careless and negligent in its having transported and disposed of solid and hazardous wastes in the Flemington landfill and that TRS had not taken proper care to prevent the deposit of such waste materials there.

TRS, which hauls and disposes of local residential and industrial waste materials, had used the Flemington landfill from 1973

---

1. *See United States v. Waste Industries*, 556 F. Supp. 1301 (E.D.N.C. 1982), *rev'd*, 734 F. 2d 159 (4th Cir. 1984).

to 1979. During that period TRS was covered by two successive liability insurance policies, one with Peerless Insurance Company (Peerless), from 12 August 1974 to 12 August 1979, the other with Pennsylvania National Mutual Casualty Insurance Company (Penn), from 17 June 1979 through 17 June 1980. Both policies provided that under certain circumstances the insurers had a duty to defend suits against the insured. TRS therefore requested defense of the suit for contribution or indemnity from Peerless and Penn. Both insurers denied that either a duty to defend or an obligation to indemnify the owners and operators of the landfill arose under the allegations and facts of the underlying action. TRS then filed this declaratory judgment action seeking a determination of the parties' rights and obligations under the policies. The parties filed cross-motions for summary judgment focused upon the scope of the coverage language in the policies.

The trial court granted summary judgment to Peerless and Penn and denied the same to TRS. The latter appealed. The Court of Appeals reversed, finding that the facts as alleged in the third-party complaints did not foreclose the possibility that TRS's potential liability came within the policies' coverage and that this possibility obligated the insurers to defend TRS in suits initiated by the third-party complaints. For the reasons set out below, the decision of the Court of Appeals is reversed.

This case is here on appeal from the Court of Appeals' reversal of summary judgment for appellant insurance companies. In reviewing the propriety of summary judgment, the appellate court is restricted to assessing the record before it. *Vassey v. Burch*, 301 N.C. 68, 74, 269 S.E. 2d 137, 141 (1980). Only those pleadings and other materials that have been considered by the trial court for purposes of summary judgment and that appear in the record on appeal are subject to appellate review. If on the basis of that record it is clear that no genuine issue of material fact existed and that the movant was entitled to judgment as a matter of law, summary judgment was appropriately granted. *Kessing v. Mortgage Corp.*, 278 N.C. 523, 180 S.E. 2d 823 (1971).

In this case, both parties originally filed cross-motions for summary judgment based upon the coverage language of the insurance policies. The parties did not dispute either the language of the policies or the presence of certain allegations in the third-

party complaints. The sole point of their contention was the scope of the policy provisions. Resolution of this issue involves construing the language of the coverage, its exclusions and exceptions, and determining whether events as alleged in the pleadings and papers before the court are covered by the policies. As such, it is an appropriate subject for summary judgment.

The scope of review by this Court is limited by the nature of the question before it, i.e., whether the appellant companies have a duty to defend appellee TRS in the federal lawsuit. Generally speaking, the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy. An insurer's duty to defend is ordinarily measured by the facts as alleged in the pleadings; its duty to pay is measured by the facts ultimately determined at trial. When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable. *Strickland v. Hughes*, 273 N.C. 481, 487, 160 S.E. 2d 313, 318 (1968); 7C J. Appleman, *Insurance Law and Practice* § 4683 (1979 & Supp. 1984).[2] Conversely, when the pleadings allege facts indicating that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend.

Where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage. 7C J. Appleman, *Insurance Law and Practice* § 4683. In this event, the insurer's refusal to defend is at his own peril: if the evidence subsequently presented at trial reveals that the events are covered, the insurer will be responsible for the cost of the defense. *Id. See also Hartford Accident & Indem. Co. v. Aetna Life & Cas. Co.*, 98 N.J. 18, 483 A. 2d 402 (1984): "This is not to free the carrier from its covenant to defend, but rather to translate its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant

---

2. Of course, allegations of facts that describe a hybrid of covered and excluded events or pleadings that disclose a mere possibility that the insured is liable (and that the potential liability is covered) suffice to impose a duty to defend upon the insurer.

to pay." *Id.* at 23-24, 483 A. 2d at 406. In addition, many jurisdictions have recognized that the modern acceptance of notice pleading and of the plasticity of pleadings in general imposes upon the insurer a duty to investigate and evaluate facts expressed or implied in the third-party complaint as well as facts learned from the insured and from other sources. Even though the insurer is bound by the policy to defend "groundless, false or fraudulent" lawsuits filed against the insured, if the facts are not even arguably covered by the policy, then the insurer has no duty to defend. *See generally* 14 Couch on Insurance 2d.§ 51:46 (rev. ed. 1982); 7C J. Appleman, *Insurance Law and Practice* § 4684.01.

The critical inquiry for this Court, then, is whether the facts in this suit to determine defendants' duty to defend the federal case against TRS concern an event that is covered by the policies appellee TRS held with appellant insurance companies.

The briefs and portions of the record before this Court include parts of three third-party complaints and a deposition. Although TRS's answer is not before us, counsel for TRS said in response to our question during oral argument that it had denied the allegations in the complaints.

Stripped to their essentials, these complaints allege the intentional disposal by TRS of solid wastes during the six-year period of the landfill's operation which contributed to the contamination of groundwater beneath the landfill. They allege that the "contributions and negligent acts and omissions" by TRS and other named trash haulers constituted the "sole and proximate cause of any contamination of the aquifer and water supply in the Flemington area . . . ." The complaints do not allege that the dumping or the contamination occurred either suddenly or accidentally; indeed, the facts alleged suggest a gradual seepage of contaminants into the aquifer.

The deposition of Gerald McKeithan, an officer of TRS, described the trash collection process and noted that eight or ten of TRS's customers were manufacturing concerns. McKeithan indicated that all customers had been verbally informed that TRS did not handle chemical or hazardous wastes but that this instruction was never incorporated into contracts or otherwise put in writing during the period that the landfill was alleged to have been in operation. McKeithan agreed with deposing counsel that

he did not consider the dumping to have been "accidental," that it had been both "expected" and "intended." Absent from the deposition, as from the complaints, is any suggestion that the dumping from 1973 to 1979 or the contamination itself was "sudden."

In order to determine whether such circumstances are covered by the provisions of TRS's liability insurance with Penn and Peerless, the policy provisions must be analyzed, then compared with the events as alleged. This is widely known as the "comparison test": the pleadings are read side-by-side with the policy to determine whether the events as alleged are covered or excluded. Any doubt as to coverage is to be resolved in favor of the insured. See Trust Co. v. Insurance Co., 276 N.C. 348, 172 S.E. 2d 518 (1970); Stout v. Grain Dealers Mutual Ins. Co., 307 F. 2d 521 (4th Cir. 1962).

Both the Penn and Peerless policies contained the following provisions and definitions:

I.  COVERAGE A—BODILY INJURY LIABILITY

COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or
Coverage B. property damage

by which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . .

This insurance does not apply: . . . .

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any

> water course or body of water; but this exclusion does
> not apply if such discharge, dispersal, release or escape is
> sudden and accidental . . . .

Both policies define "occurrence" as "an accident, including con-
tinuous or repeated exposure to conditions, which results in bodi-
ly injury or property damage neither expected nor intended from
the standpoint of the insured." This Court has defined "accident"
as "an unforeseen event, occurring without the will or design of
the person whose mere act causes it; an unexpected, unusual, or
undesigned occurrence; the effect of an unknown cause, or, the
cause being known, an unprecedented consequence of it; a casual-
ty." *Tayloe v. Indemnity Co.*, 257 N.C. 626, 627, 127 S.E. 2d 238,
239-40 (1962).

In short, these policies cover occurrences (which are unex-
pected by definition), which may occur suddenly or gradually, and
which result in damage. Excluded from such coverage is a class of
injuries caused by pollution or contamination. Excepted from the
exclusion is the discharge, dispersal, release, or escape of
pollutants or contaminants that occurs suddenly and accidentally.

We do not perceive these provisions to be either ambiguous
or, except for the repeated appearance of "accident," redundant.[3]
In our view, this is an instance where nontechnical words (except
for "occurrence," which is defined in the policy) can be given the
same meaning they usually receive in ordinary speech. Nor does
their context require us to do otherwise. *Grant v. Insurance Co.*,
295 N.C. 39, 42, 243 S.E. 2d 894, 897 (1978). This Court has held
that:

> No ambiguity . . . exists unless, in the opinion of the court,
> the language of the policy is fairly and reasonably susceptible
> to either of the constructions for which the parties contend.
> If it is not, the court must enforce the contract as the parties
> have made it and may not, under the guise of interpreting an
> ambiguous provision, remake the contract and impose liabili-
> ty upon the company which it did not assume and for which
> the policyholder did not pay.

3. But see cases cited in note 4 *infra.* See also discussion of "sudden and ac-
cidental" exception *infra.*

*Trust Co. v. Insurance Co.*, 276 N.C. 348, 354, 172 S.E. 2d 518, 522. Although it is possible to perceive ambiguity in the policy language, it strains at logic to do so. A common sense reading of that language reveals that the exclusion narrows a virtually limitless class of events termed "occurrences," which can occur suddenly or over the course of time, to nonpolluting events or to polluting events that occur "suddenly and accidentally."

The definition of "occurrence" and its description as an "accident" significantly restrict "occurrences" to events that are unexpected and unintended as viewed from the standpoint of the insured. *Edwards v. Akion*, 52 N.C. App. 688, 691, 279 S.E. 2d 894, 896, *aff'd per curiam*, 304 N.C. 585, 284 S.E. 2d 518 (1981). Even intentional acts, the consequences of which are unexpected, have been held to qualify as "occurrences." In *Industrial Center v. Liability Co.*, 271 N.C. 158, 155 S.E. 2d 501 (1967), this Court held that the intentional felling of shrubs and trees belonging to another was an "occurrence" where it was done in the mistaken belief, induced by a surveyor's error in locating the property line, that the trees were on plaintiff's property.

By focusing likewise on the notion of expectation or foresight, the Court of Appeals has held that potentially damaging events that can be anticipated are not "occurrences" within the meaning of the policy. In *City of Wilmington v. Pigott*, 64 N.C. App. 587, 307 S.E. 2d 857 (1983), *disc. rev. denied*, 310 N.C. 308 (1984), a building inspector had demolished a building in the performance of his governmental duties. Because the inspector's decision "did not happen by chance and was not unexpected, unusual or unforeseen," it was not an "occurrence." *Id.* at 589, 307 S.E. 2d at 859. But in *Wiggins v. City of Monroe*, 73 N.C. App. 44, 326 S.E. 2d 39 (1985), facts nearly identical to those in *Pigott* were held to comprise an "occurrence" because the building inspector had allegedly exceeded the scope of his authority. Although both sets of circumstances occurred in the ordinary course of business, the *Wiggins* court considered the demolition to be accidental and an "occurrence." It was the breach of duty, not the demolition, that could not reasonably have been anticipated by the city.

Penn and Peerless argue that the routine business conduct of intentionally dumping waste materials, as alleged, was not an "occurrence." For the same reasons that the Court of Appeals distin-

guished *Wiggins* from *Pigott*, we disagree. Whether events are "accidental" and constitute an "occurrence" depends upon whether they were expected or intended from the point of view of the insured. Just as it was not the demolition but the breach of authority that designated an otherwise routine demolition an "occurrence," it was not the routine dumping but the arguably unintended, unexpected leaching of contaminants into the groundwater that constituted the "occurrence" for the purpose of TRS's insurance coverage.

Other courts considering whether routine dumping that resulted in contamination constitutes an "occurrence" have also looked to whether the damage was expected or intended. In *Buckeye Union Ins. Co. v. Liberty Solvents and Chemicals*, 17 Ohio App. 3d 127, 132, 477 N.E. 2d 1227, 1233 (1984), the leakage of chemicals from drums was neither expected nor intended by the company storing those chemicals. The court accordingly found that the release of those pollutants was an "occurrence." In *Mraz v. American Univ. Ins. Co.*, 616 F. Supp. 1173 (D. Md. 1985), drums were dumped in a clay pit that both the parties and county health officials had thought would contain any leaking. The resulting contamination of the environment was held to be an "occurrence" based on the reasoning of *Buckeye*. And in *Steyer v. Westvaco Corp.*, 450 F. Supp. 384 (D. Md. 1978), the court concluded that "the words 'unexpected or unintended' or words of similar import . . . with respect to the definition of 'occurrence' do not refer to unknown, unexpected, or unintended emissions from the Westvaco plant, but instead refer to unknown, unexpected, and unintended damage . . . ." *Id.* at 388.

Unlike the focus of the "occurrence" language in the policies' broad coverage provisions, the focus of the "pollution exclusion" is *not* upon intention, expectation, or even foresight.[4] Rather, the

---

4. *But see* 3 R. Long, *Law of Liability Insurance* App-58 (1973): "Exclusion (f) is new. It eliminates coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence are excluded by definition of 'occurrence.' "

This gloss on the pollution exclusion has led more than one court astray. The concern with expectation or intention, which is already comprehended in the definition of "occurrence," has led these courts to see the exclusion as no more than a restatement of that definition and to overlook the fact that the pollution exclusion clause is concerned more with the nature of the *damage* than with the accidental

exclusion clause is concerned less with the accidental nature of the occurrence than with the nature of the damage. The exclusion limits the insurer's liability for accidental events by excluding damage caused by the gradual release, escape, discharge, or dispersal of irritants, contaminants, or pollutants. The focus of the exclusion is not upon the release but upon the fact that it pollutes or contaminates. When courts consider the release alone to be the key to the pollution exclusion clause, the sudden and accidental exception can be bootstrapped onto almost any allegations that do not specify a gradual release or emission. For example, in *Travelers Indem. Co. v. Dingwell*, 414 A. 2d 220 (Me. Sup. Jud. Ct. 1980), the pleadings alleged that Dingwell's negligence caused certain chemicals from its industrial waste facility to "permeate" the ground and "contaminate" the well water. There was no mention or suggestion that the release had been sudden and accidental. Nevertheless, the court found potential for the exception because it perceived the release, not the permeation or damage, to be the polluting occurrence. Because the manner of the release itself was not *known* to be anything but sudden, the *Dingwell* court perceived the "behavior of the pollutants in the environment, *after* release, [to be] irrelevant . . . ." *Id.* at 225. It chided the court below for failing "to distinguish between the gradual permeation of the ground, by which the water table was ultimately polluted, and the initial release of the pollutants from Dingwell's facility." *Id.* at 224. We consider the *Dingwell* court's construction of the pollution exclusion to be so restrictive as to vitiate the "sudden and accidental" exception. Only that exception plainly points to the moment of release or escape. The exclusion itself more broadly describes a contaminating discharge, an irritating emission, a polluting release into air or water or onto land.

The policy reasons for the pollution exclusion are obvious: if an insured knows that liability incurred by all manner of negli-

---

nature of its cause. *See, e.g., Jackson Twp. Etc. v. Hartford Acc. & Indem.*, 186 N.J. Super. 156, 164, 451 A. 2d 990, 994 (1982) ("the clause can be interpreted as simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the injury was neither expected nor intended"); *United Pac. Ins. v. Van's Westlake Union*, 34 Wash. App. 708, 664 P. 2d 1262 (1983) (the pollution exclusion clause did not apply where a hole in an 80,000 gallon tank had emitted gasoline into the ground over the period of "some months" because neither the hole nor the damage had been expected or intended); *Molton, Allen and Williams, Inc. v. St. Paul F. & M. Ins.*, 347 So. 2d 95 (Ala. 1977) (pollution exclusion clause held ambiguous and meant to cover only industrial pollution and contamination).

gent or careless spills and releases is covered by his liability policy, he is tempted to diminish his precautions and relax his vigilance. Relaxed vigilance is even more likely where the insured knows that the intentional deposit of toxic material in his dumpsters, so long as it is unexpected, affords him coverage. In this case, it pays the insured to keep his head in the sand.

From the insurer's perspective, the practical reasons for the pollution exclusion are likewise clear: the lessons of Love Canal and sites like it have revealed the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances into the environment. In addition, putting the financial responsibility for pollution that may occur over the course of time upon the insured places the responsibility to guard against such occurrences upon the party with the most control over the circumstances most likely to cause the pollution.[5]

The "sudden and accidental" exception to the pollution exclusion has been the turning point for many courts concerning whether occurrences of pollution or contamination should be covered. An occurrence by definition is accidental. When it is sudden, it is covered. Yet even "sudden" has been construed as being synonymous with "occurrence" and "accidental," rendering the coverage language, its exclusion, and exception redundant and indistinguishable. The court in *Lansco, Inc. v. Environmental Protec. Dep't*, 138 N.J. Super. 275, 350 A. 2d 520 (Ch. Div. 1975), *aff'd*, 145 N.J. Super. 433, 368 A. 2d 363 (App. Div. 1976), *cert. denied*, 73 N.J. 57, 372 A. 2d 322 (1977) (quoting Webster's), construed "sudden" to be no more than another synonym for "accidental"—i.e., "happening without previous notice or on very brief notice; unforeseen; unexpected; unprepared for." "Sudden"

---

5. It is worth noting that since 1977 separate policies covering "environmental impairment" have been made available by some insurance brokers. These eliminate the words "occurrence" and "accidental" from the coverage language and specifically include claims arising from single, repeated, or continuing "environmental impairments." *See* Pfennigstorf, *Environment, Damages and Compensation*, 1979 ABA Research Journal at 442-44.

"Environmental impairments" coverage was not available to TRS during most of the period the contamination allegedly occurred, and its emergence has no bearing on this case. However, the existence of such coverage is enlightening concerning the underwriters' understanding of the scope of coverage in the liability policy TRS did have.

has also been construed "not [to] be limited to an instantaneous happening." *Allstate Ins. Co. v. Klock Oil Co.*, 73 App. Div. 2d 486, 426 N.Y.S. 2d 603 (1980).

An accurate construction of "sudden," however, must go beyond semantics: all three terms must be read within their contexts. "Occurrence" relates to the anticipation of an event — whether or not it was intentional or expected. The pollution exclusion relates chiefly to the fact that the release allegedly results in some polluting or contaminating damage. The exception also describes the event — not only in terms of its being unexpected, but in terms of its happening instantaneously or precipitantly. Courts that have construed "sudden" broadly, defining it in terms of the expectation element of accident rather than focusing on its temporal significance, have deemed polluting events excepted that otherwise appear to fit squarely within the exclusion. For example, the court in *Jackson Twp., Etc. v. Hartford Acc. & Indem.*, 186 N.J. Super. 156, 164, 451 A. 2d 990, 994, determined the deposit of toxic wastes in a landfill, resulting in seepage of pollutants into the aquifer, to be sudden and accidental: "regardless of how many deposits or dispersals may have occurred, and although the permeation of pollution into the ground water may have been gradual rather than sudden, the behavior of the pollutants as they seeped into the aquifer is irrelevant if the permeation was unexpected." *See also Allstate Ins. Co. v. Klock Oil Co.*, 73 App. Div. 2d 486, 426 N.Y.S. 2d 603, in which the escape of gasoline from a negligently installed tank was held to be sudden and accidental, although not "instantaneous."

Other courts, which have read "sudden" temporally, as describing an abrupt or precipitant event, have made more logical distinctions between releases that occur suddenly and accidentally and releases that do not. For example, in *Lansco, Inc. v. Environmental Protec. Dep't*, 138 N.J. Super. 275, 350 A. 2d 520, an oil spill caused by vandalism was adjudged sudden and accidental. And in *City of Milwaukee v. Allied Smelting Corp.*, 117 Wis. 2d 377, 344 N.W. 2d 523 (Wis. App. 1983), in which the discharge of acid into city storm sewers over a period from two to ten years had caused them to deteriorate, the court found the "record and common sense" to firmly refute the contention that the runoffs had been sudden and accidental. *But cf. Farm Family Mut. Ins.*

*Co. v. Bagley,* 64 App. Div. 2d 1014, 409 N.Y.S. 2d 294 (1978), in which damages arising from unintended dispersal of chemicals sprayed by the insured onto his neighbor's land were held to be within the exception to the pollution exclusion clause because the damage — not the release — had been sudden and accidental.[6]

The facts alleged in the pleadings of the case sub judice describe the "contribution" over a number of years of contaminating materials to a landfill, eventually rendering groundwater beneath it hazardous for human consumption and other uses. The parties do not dispute that TRS deposited waste materials at the landfill throughout the years the alleged contamination took place. Although such daily dumping, effected in the daily course of business, could not be deemed an occurrence for purposes of coverage, the leaching allegedly resulting in contamination *was* arguably "accidental," i.e., it was arguably unexpected and unintended. The result, if not the damage-engendering series of acts, was an occurrence.

Nevertheless, the events alleged in the pleadings and supported by the deposition fit squarely within the language of the exclusion clause. Waste material that has leached into and contaminated groundwater is clearly excluded by the plain terms of the pollution exclusion. And because the "sudden" release or escape of contaminants was neither expressly nor impliedly alleged in the pleadings or deposition,[7] the alleged occurrences remain outside the policy coverage.

---

6. Some courts have held that when emissions occur on a regular basis or in the course of business, the "sudden and accidental" exception does not apply. Under such circumstances, even if each occurrence is viewed separately and each occurs suddenly, doubt is cast with each recurrence upon whether it was accidental: the fact that the accident recurs increases expectation and may even infer intent. In *Great Lakes Container v. National Union Fire Ins.,* 727 F. 2d 30 (1st Cir. 1984), wastes from a barrel reconditioning facility were routinely deposited and discharged into the ground. The government had charged that pollution had been "a concomitant of [the insured's] regular business activity." 727 F. 2d at 33. The First Circuit held that, as such, the migration of pollutants and contaminants into local drinking water was excluded from coverage: it was neither sudden and accidental nor, for that matter, an "occurrence." *See also American States Ins. Co. v. Maryland Cas. Co.,* 587 F. Supp. 1549 (E.D. Mich. 1984); *Barmet of Indiana v. Security Ins. Group,* 425 N.E. 2d 201 (Ind. Ct. App. 1981).

7. We reject TRS's suggestion that the sudden discovery of the contamination satisfies the exception. The exception clearly comprehends the damaging act, not the act of discovery.

The salient features of the case before us were also present in *Techalloy Co. v. Reliance Ins. Co.*, 338 Pa. Super. 1, 487 A. 2d 820 (1984). In *Techalloy,* the complaint alleged injuries resulting from the contamination of well water by Techalloy's reckless storage or dumping of trichloroethylene. The court concluded, "At best, Techalloy could prove that the discharge was accidental. That alone, however, would not substantiate their position since the language of the policy unambiguously states that there will be no coverage for toxic discharge into the environment unless that discharge is both sudden *and* accidental." *Id.* at 826-27. The complaint "did not allege a sudden event." Rather, the allegations identified the source of the problem as "contamination which occurred on a 'regular or sporadic basis from time to time during the past 25 years.' " *Id.* at 827. *See also Transamerica Insurance Co. v. Sunnes,* 77 Or. App. 136, 711 P. 2d 212 (1985). The result is the same with the case at bar.

We hold that Penn and Peerless are under no obligation to defend TRS in the federal court actions concerning the contamination of the aquifer by the leaching of waste materials from the Flemington landfill.

Because we conclude that Penn and Peerless have no duty to defend TRS, we need not address the issue raised by the Court of Appeals whether complaints demanding indemnification for the costs of complying with an injunction, as opposed to demands for money damages, invoke the insurer's duty to defend.

The decision of the Court of Appeals is

Reversed.