ST. PAUL FIRE & MARINE INSURANCE COMPANY, individually and as subrogee of James E. Collins, M.D., Plaintiff–Appellee,

v.

VIGILANT INSURANCE COMPANY, Defendant–Appellant,

James E. Collins, as an involuntary plaintiff, Defendant.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, individually and as subrogee of James E. Collins, M.D., Plaintiff–Appellant,

v.

VIGILANT INSURANCE COMPANY, Defendant–Appellee,

James E. Collins, as an involuntary plaintiff, Defendant.

Nos. 89–1835, 89–1837.

United States Court of Appeals, Fourth Circuit.

Argued April 3, 1990.

Decided Nov. 21, 1990.

As Amended Dec. 6, 1990.

Vance Barron, Jr., Smith, Helms, Mulliss & Moore, argued, Greensboro, N.C., for defendant-appellant.

Frederick Kingsley Sharpless, argued (J. Reed Johnston, Jr., on brief), Tuggle, Duggins, Meschan & Elrod, P.A., Greensboro, N.C., for plaintiff-appellee.

Before PHILLIPS, Circuit Judge, BUTZNER, Senior Circuit Judge, and GARBIS, District Judge for the District of Maryland, sitting by designation.

GARBIS, District Judge:

St. Paul Fire & Marine Insurance Company ("St. Paul") brought a declaratory judgment action against Vigilant Insurance Company ("Vigilant") for contribution for the costs paid by St. Paul in defending and settling two medical malpractice actions against James E. Collins, M.D., a psychiatrist who was insured by the two companies at different periods of time. The district court granted summary judgment in favor of St. Paul. 724 F.Supp. 1173. Vigilant appeals.

Vigilant insured Collins under an "occurrence" professional liability policy in effect from May 1, 1975, until May 1, 1976, with coverage limits of $500,000 per claim and $1,500,000 in the aggregate. Under this policy Vigilant would pay all sums Collins became legally obligated to pay because of injury occurring during the policy period and arising out of Collins' rendering or failure to render professional services. This policy renewed prior policies dating back to at least June 30, 1973.

St. Paul insured Collins under a professional liability policy for claims made during the period May 1, 1976, to March 1, 1980, with a liability limit of $1 million. This policy included an endorsement allowing claims that arose during the policy period to be subsequently reported, so it effectively provided coverage for claims arising from events occurring between May 1, 1976, and March 1, 1980, whenever reported.

Bonnie Carol Gwyn was a patient of Collins from January 21, 1976, until January 12, 1977, a period spanning the terms of the two carriers' policies. On December 17, 1984, Bonnie Gwyn filed a medical malpractice action against Collins in North Carolina state court, alleging that Collins had initiated a sexual relationship with her and that in so doing he had breached his duty to ensure that she received adequate medical care. The complaint alleged severe

mental, physical and emotional trauma, as well as damage to her marital relationship with her husband, Henry Gwyn. J.A. 87. That action was voluntarily dismissed on September 19, 1985, but it was re-instituted in October 1985, making substantially the same allegations. The portions of the Bonnie Gwyn complaint pertinent to the instant appeal relate to the timing of the events alleged. The complaint reads as follows:

In 1976 and thereafter, [the defendant was a licensed physician.] During 1976, [Bonnie Gwyn consulted with Collins and the physician-patient relationship was established.] As part of her treatment by the defendant in 1976 and thereafter, [the plaintiff was encouraged to confide in Collins and become dependent on him emotionally.] While the physician-patient relationship existed, and by means of his psychiatric treatment of the plaintiff, the defendant induced and caused the plaintiff to engage in sexual conduct with him.

J.A. 87–89.

Before Bonnie Gwyn filed her first complaint, her husband, Henry Gwyn, had sued Collins in North Carolina state court on August 24, 1984, making similar allegations about the relationship between Collins and Bonnie Gwyn. The causes of action included "criminal conversation," "alienation of affections," malpractice, and intentional infliction of emotional distress. J.A. 64–72. That action was voluntarily dismissed on April 24, 1986, but it was re-instituted on April 22, 1987. Henry Gwyn's second complaint was substantially similar to the first, except that it added a cause of action for fraud. J.A. 74. The allegations in both complaints relating to the timing of the events were as follows:

During the years of 1976 and 1977, [Collins practiced psychiatry in North Carolina.] During the year of 1976 and continuing into the year of 1977, [Bonnie Gwyn consulted Collins and began to rely on him emotionally.] After accepting the

plaintiff's wife as his patient, [Collins initiated sexual activities with Bonnie Gwyn.] These acts by the defendant were continued over a long period of time during the years of 1976 and 1977 [and were done with malice and intent to harm.]

J.A. 64–66. The second complaint repeated the quoted passages, and in the fraud count stated:

At the time the plaintiff's wife consulted with the defendant ... in his capacity as a physician, medical doctor, and psychiatrist for treatment in 1976 and continuing into the year 1977 [Collins represented he was skilled in the field but never intended to treat her with the skill represented.]

J.A. 74–81. In none of the complaints did either plaintiff specify when during the 1976–77 period, i.e., when during the doctor-patient relationship between Bonnie Gwyn and Collins, the sexual relationship between doctor and patient began.

St. Paul received notice of the first round of suits shortly after they were filed in 1984. Vigilant was notified of the two plaintiffs' claims by letter dated May 28, 1986, from Collins' attorney.[1] At that time, the first round of suits had been dismissed, and Bonnie Gwyn's second suit was then pending. Henry Gwyn's second suit had not yet been filed, but the letter informed Vigilant that Henry Gwyn's first suit had been filed and then dismissed. The letter quoted portions of the Bonnie Gwyn complaint relating to the timing of treatment and allegations of malpractice. J.A. 303–04.

Vigilant responded by letter dated September 3, 1986, denying coverage and declining to provide Collins with a defense:

Following a review of the policy, it is the position of Vigilant Insurance Company that, *although the Complaint is vague,* the alleged acts did not occur within Vigilant's policy term. The plaintiff testified

---

1. At the time the first set of suits was filed, Collins did not recall that he had once had a policy with Vigilant. Moreover, he had destroyed many of his records upon moving from North Carolina to Florida in 1980. The exist-

ence of the Vigilant policy was not discovered until a deposition of a hospital record custodian was held during discovery regarding the Bonnie Gwyn suit. J.A. 114–16.

on deposition (page 25) that the first physical contact occurred in May of 1976. J.A. 308 (emphasis added).[2] Citing a policy provision that this "insurance applies only to injury which occurs during the policy period," Vigilant declined liability and any duty to defend the Bonnie Gwyn suit. *Id.*

Bonnie Gwyn testified consistently during discovery that her sexual contact with Collins started during May 1976 or later. In her deposition, she testified that her first physical contact with Collins was a hug in May 1976. They hugged at the close of the next four to six weekly therapy sessions. Later, he kissed her on the mouth. Events progressed, and in July 1976 the first oral sex act occurred. J.A. 433–37. She later testified by affidavit that "during approximately May 1976" Collins started hugging and kissing her during office visits. On January 12, 1987, Bonnie Gwyn stated in a psychiatric interview that Collins hugged her for the first time in May 1976, and that the first sexual intimacy occurred in July 1976. J.A. 243. However, despite this prior testimony, on the same day that St. Paul settled her claim Bonnie Gwyn signed an affidavit in which she stated for the first time that Collins had begun to hug and kiss her "by the end of April of 1976." J.A. 520.

Two weeks before Bonnie Gwyn's trial date of March 27, 1987, Vigilant notified the parties that it had retained an attorney to assist in Collins' defense. Vigilant's attorney did participate in Collins' defense, and before the Bonnie Gwyn claim was settled Vigilant incurred $6,070 in defense costs. St. Paul settled Bonnie Gwyn's claim against Collins on March 25, 1987, paying her $425,000.

After Henry Gwyn's complaint was refiled on April 22, 1987, Vigilant offered to join in defending Collins, but only if "Collins and St. Paul agree to a full reservation of Vigilant's right to deny coverage." J.A. 111. Collins and St. Paul refused to sign

such an agreement, and Vigilant did not subsequently aid in Collins' defense. St. Paul settled Henry Gwyn's claim against Collins on May 3, 1989, paying him $85,810.

After May 28, 1986, the date Vigilant was notified of the Gwyns' complaints, St. Paul expended $123,818 in defending the Bonnie Gwyn claim and $30,190.01 in defending the Henry Gwyn claim, for a total of $154,008.01. St. Paul is making no claim for defense costs incurred *before* Vigilant received notice of the underlying claims. J.A. 586. The total paid by St. Paul for costs of defense and settlement was $664,818.01. St. Paul and Vigilant have stipulated that these amounts were reasonable settlements and costs for the Gwyns' claims. J.A. 590–92.

On May 15, 1987, St. Paul filed its complaint in this action to recover contribution for the settlement and defense costs it incurred. Vigilant counterclaimed for a declaratory judgment that it had no such obligations. The district court at first denied St. Paul's motion for summary judgment. As the trial date approached and the district court reviewed the parties' pretrial submissions, including additional briefing and stipulations, the court reversed itself and granted summary judgment in St. Paul's favor. J.A. 563. The district court awarded St. Paul one-half of the settlements it had paid out to the Gwyns. The district court also awarded one-half of the defense costs incurred by St. Paul after Vigilant was first notified of the underlying claims, although the court credited against this sum the defense costs Vigilant itself incurred during the two-week period before the Bonnie Gwyn case was settled. The district court denied St. Paul's request for prejudgment interest on the sum owed by Vigilant. After calculating the appropriate figures, the district court entered judgment for St. Paul in the amount of $329,374.01. J.A. 590–93. Vigilant now appeals.[3]

Vigilant argues on appeal that it did not breach its duty to defend Collins, because

2. By letter dated June 11, 1986, Collins' personal attorney had provided more information to Vigilant about the underlying claims, including depositions of Collins, both Gwyns, and a former employee of Collins. J.A. 305–06.

3. Although St. Paul cross-appealed from the district court's denial of prejudgment interest, Vigilant later conceded that the district court erred in withholding prejudgment interest. Vigilant

the allegations of the underlying complaints demonstrated that the alleged injuries took place after its policy expired. Moreover, even if it did breach its duty to defend because the injuries could possibly have occurred during the policy period, Vigilant argues it should not now be prohibited from arguing that the injuries in fact did not occur until after May 1, 1976. Finally, Vigilant asserts that even if it is liable for a portion of the settlements paid out by St. Paul, it is not liable for one half of these sums, but only for a smaller portion. St. Paul takes the contrary position on each of these points and argues that the district court's decision should be affirmed.

Under North Carolina law, an insurer's duty to defend is "ordinarily measured by the facts as alleged in the pleadings." *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, 377 (1986). "When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." *Id.* In order to determine if the allegations of the complaint give rise to a duty to defend,

> the policy provisions must be analyzed, then compared with the events as alleged. This is widely known as the "comparison test": the pleadings are read side-by-side with the policy to determine whether the events as alleged are covered or excluded. Any doubt as to coverage is to be resolved in favor of the insured.

*Id.,* 340 S.E.2d at 378.

The allegations in the Gwyns' complaints state that the events giving rise to the plaintiffs' claims occurred during the time Collins treated Bonnie Gwyn. Bonnie Gwyn alleged that the physician-patient relationship began "during 1976," and that "while the physician-patient relationship existed" Collins induced the sexual relationship. Henry Gwyn alleged that "during the year of 1976 and continuing into the year of 1977," Gwyn consulted Collins, and that "after accepting the plaintiff's wife as

his patient" Collins initiated the sexual activity. Henry Gwyn's complaint summarized: "These acts by the defendant were continued over a long period of time during the years of 1976 and 1977."

These allegations clearly refer to the entire treatment period as the time in which the events occurred. Nowhere do the complaints allege that the plaintiffs seek relief for only the time after Collins first touched Bonnie Gwyn. Rather, they indicate that in initiating the sexual relationship Collins took advantage of Bonnie Gwyn's trust and reliance, which had been established during the whole course of her treatment. Vigilant insured Collins from the time he began treating Bonnie Gwyn until May 1, 1976. Therefore, the allegations of the complaints pass the "comparison test." Each complaint on its face imposes on Vigilant a duty to defend.[4]

Vigilant argues that it should be entitled to rely on Bonnie Gwyn's testimony during discovery to the effect that the sexual relationship didn't begin until after May 1, 1976, *i.e.*, after Vigilant's policy ran out. Vigilant also argues that the court shouldn't accept the new affidavit Bonnie Gwyn signed on the date of her settlement to the effect that the relationship began in April.

Although (ignoring the "settlement affidavit") Bonnie Gwyn stated that the sexual contact did not begin until July and that the first physical contact did not begin until May, the complaints allege malpractice during the physician-patient relationship, which began during Vigilant's policy period. Vigilant argues that Collins could not be liable until he actually touched her, but it cites no authority for that legal proposition, and it does not appear that this is necessarily the case. The malpractice allegations themselves related to the doctor-patient relationship as a whole, which was established before the physical relationship with Collins. Despite the statements about the timing of the physical relationship, the

Br. 56; St. Paul Br. 43. Therefore, the court need not address that issue.

**4.** Vigilant's own acknowledgement in its letter denying coverage that "the Complaint is vague" is itself an indication that the complaints pass the "comparison test" with respect to the Vigilant policy. J.A. 308.

allegations were sufficient to invoke Vigilant's duty to defend.

 In any event, under North Carolina law, any doubts are to be resolved in favor of coverage, and the insurer avoids its duty to defend only if "the facts are not even arguably covered by the policy." *Waste Management of Carolinas, Inc.,* 340 S.E.2d at 378. If there is *any* chance that Gwyn's claim even *arguably* developed during the Vigilant policy period, Vigilant had a duty to defend. We agree with the district court that Vigilant breached its duty here.

 Vigilant argues that, even if it did breach its duty to defend Collins against allegations that arguably related to the period its policy was in effect, it should now have the opportunity to determine whether any of the damage in fact occurred within the policy period. If no injury occurred during the policy period, Vigilant argues, it would not have to share in the Gwyns' settlements at all. Under North Carolina law, however, in breaching its duty to defend Vigilant relinquished any right to litigate whether the events actually occurred during its policy period or not, and it may not now attempt to demonstrate that none of the events occurred during its policy period.

In *Ames v. Continental Casualty Co.,* 79 N.C.App. 530, 340 S.E.2d 479 (1986), the court held that Continental Casualty Company ("Continental") had breached its duty to defend its insured, Pullen, against a claim of accountant's malpractice. Pullen terminated its policy with Continental on November 30, 1971, and on December 1, 1971, it began a policy with underwriters at Lloyd's of London. Continental declined any duty to defend Pullen on the underlying claims, and Lloyd's, without any participation from Continental, defended the claim and eventually settled it. *Ames* was the appeal from a declaratory judgment action brought by the Lloyd's underwriters against Continental for contribution for the costs of defending and settling the malpractice claim.

In *Ames,* Continental wanted to contest its obligation to contribute to the settlement, arguing that part of the claim could have occurred outside its policy period. As Vigilant argues here, Continental wanted the opportunity to determine what portion of the complaint occurred within and outside its policy period in order to show that it should be liable for only the portion of the settlement relating to the events occurring during its policy period.

The court rejected Continental's argument. Because it found that Continental breached its duty to defend, the court held that Continental had waived any opportunity to contest the timing of the events giving rise to the underlying claim. Noting that Continental had the opportunity to raise its coverage defenses in the underlying action, the court stated that

> Continental unjustifiably refused to defend Pullen in that action. When an insurer without justification refuses to defend its insured, the insurer is estopped from denying coverage and is obligated to pay the amount of any reasonable settlement made in good faith by the insured of the action brought against him by the injured party. *Nixon v. Liberty Mutual Insurance Co.,* 255 N.C. 106, 120 S.E.2d 430 (1961); *Maneikis v. St. Paul Ins. Co. of Illinois,* 655 F.2d 818 (7th Cir.1981). By denying liability and refusing to defend claims covered by the insurance policy, the insurance company commits a breach of the policy contract and thereby waives the provisions defining the duties and obligations of the insured. . . .
>
> In view of Continental's wrongful breach of the policy contract we find it unnecessary to discuss whether Lloyd's has failed to show that any of the amount of the settlement represents payment for wrongful acts occurring in 1971.

*Id.,* 340 S.E.2d at 485.

Given the clear holding in *Ames* that by breaching its duty to defend an insurer waives any opportunity to litigate whether the underlying events occurred within the policy period, the court rejects Vigilant's arguments in this case. The district court properly held that once Vigilant had breached its duty to defend Collins, it could

not later avoid all liability for the Gwyns' settlements by arguing that none of the underlying events actually occurred during Vigilant's policy period.[5]

■ Given the court's holding that Vigilant breached its duty to defend and forfeited its right to contest whether the underlying events occurred during its policy period, the court must now determine what portion of the settlement and of the costs of defense Vigilant must pay St. Paul.[6] As to costs of defense, under *Ames*, once it is shown that Vigilant breached its duty to defend, the remedy for the breach is that it should share equally in the costs of defending Collins. "We hold both parties had a duty to defend Pullen and thus the defense costs should be shared equally." *Ames*, 340 S.E.2d at 486. The district court's allocation of the costs of defense was therefore proper.

■ As to the settlements themselves, we hold, as did the district court, that they should be divided equally between the insurers, although we reach the same result by different reasoning. Based on the *Ames* decision's equal division of the costs of defense, the district court held that "plaintiff and defendant are equally obligated to contribute to the settlement amounts, subject to relevant provisions in their insurance policies." J.A. 584. Based on its reading of the two policies' "other insurance" clauses, the district court held

that defendant is liable for one-half of the total settlement amounts.

It appears that the district court may have been incorrect in relying on the policies' "other insurance" clauses to resolve this question. As Vigilant points out, such clauses apply only when the coverage is concurrent. Where, as here, the policies periods did not overlap at all, such clauses are not applicable. *See City of Greensboro v. Reserve Ins. Co.*, 70 N.C.App. 651, 321 S.E.2d 232, 237–38 (1984) (court agreed that "other insurance" clauses were "at issue here because these policies provide overlapping or concurrent coverage" for the underlying claim, although the coverage was not completely concurrent); *Horace Mann Ins. Co. v. Continental Casualty Co.*, 54 N.C.App. 551, 284 S.E.2d 211, 212 (1981) (court considered "other insurance" clauses where both insurers had separate policies in force and effect at the time the complaint was filed).

St. Paul attempts to avoid these decisions by arguing that under *Ames*, since Vigilant breached its duty to defend and is now held to provide primary coverage along with St. Paul, concurrent coverage now exists with respect to the Gwyns' claims. St. Paul provides no authority for the assertion that non-concurrent coverage metamorphoses into concurrent coverage for the purposes of applying the "other insurance" clauses in this policy, and we decline to adopt that reasoning. We agree with Vigilant that

---

5. Vigilant does not contest that, in breaching its duty to defend, an insurer waives some policy provisions. But Vigilant argues that this waiver is limited to provisions putting duties on the insured, such as requiring the insured to give notice of any claim to the insurer, or forbidding the insured to negotiate a settlement without the insurer's involvement. Provisions like these are considered waived because the insurer should not be able to rely on the provisions of the insurance contract that put duties on the insured, when it breached its own duty under that same contract to defend the insured.

Vigilant contends that this type of estoppel cannot be used to create liability beyond the scope of the contract or create more coverage than the insured paid for. Here, Vigilant argues, Collins should not get the benefit of additional coverage, either beyond the term of the policy or for risks the policy did not insure, just because Vigilant breached a term of the policy it *did* issue.

Although Vigilant's argument may have merit, the court rejects it on the authority of *Ames*.

One of the cases on which Vigilant relies in drawing this distinction between waiver of "forfeiture" provisions and waiver of "coverage" provisions, *Nixon v. Liberty Mut. Ins. Co.*, 255 N.C. 106, 120 S.E.2d 430 (1961), was itself cited by the *Ames* court in support of its own holding. Vigilant notes its disagreement with the holding in *Ames*, and with the *Ames* court's reading of *Nixon*. Given the strong similarities between *Ames* and the case now before this court, however, the court must follow North Carolina law on this point as articulated in *Ames*.

6. Vigilant relies on additional theories in arguing that it did not waive and is not now estopped from contesting whether its policy covered the underlying events, including arguments based on equitable estoppel, its own alleged reservation of rights, and the insured's alleged late notice. However, the same rationale used in *Ames* can be used to reject these additional theories. Therefore, these theories do not need to be individually addressed.

North Carolina law applies such other insurance clauses only where the coverages overlap.[7]

 In addition, although both sides argue this point in different ways, we do not believe that *Ames* resolves this question. After it held that Continental had breached its duty to defend and was not entitled to litigate whether the underlying injuries arose during its policy period, the *Ames* court held that Continental was liable to the full limits of its policy, $1,000,000. The court held that the Continental policy provided primary coverage during its term; the Lloyd's policy acted as excess coverage during Continental's policy term and as primary coverage thereafter. Given that Continental acknowledged that the losses attributable to the Continental policy period in 1971 could reasonably total $11.6 million, the court held that Continental should contribute the full amount of its policy limits towards the total settlement of $5.25 million. *Ames*, 340 S.E.2d at 486.

It overstates the *Ames* holding to argue that the *Ames* court decided how much Continental was to contribute "by reference to the provisions of the respective policies," as St. Paul asserts in arguing that the court should apply the "other insurance" clauses in both policies and construe them to hold the carriers equally liable. St. Paul Br. 37. Given Continental's policy limits of $1 million and a total settlement of $5.25 million, the court merely held that Continental should be held liable for its policy limit, but no more. Such a holding does not require that a court look to "the terms of the policy" in every case to determine the liability as between the two carriers.

In fact, even if we felt that the other insurance provisions could apply, a holding

that the court should refer to the Vigilant policy provisions would be inconsistent with the major holding in *Ames*. We have already held, based on *Ames*, that Vigilant waived any coverage defense based on the timing of the underlying events once it breached its duty to defend. Even if we construed Vigilant's "other insurance" clause to reduce Vigilant's liability to one-third, we would not apply it to reduce Vigilant's liability. To hold that having breached its duty to defend, Vigilant is estopped to rely on its policy provisions to avoid coverage, requires us, we think, to hold also that it may not rely on its "other insurance" clause to reduce its liability.

Similarly, we reject Vigilant's argument that it should be liable for only those damages occurring during the policy period. It would be inconsistent to say that Vigilant may not *avoid* coverage altogether because no injury occurred during the policy period, but that it may *limit* its liability to the injury occurring during that time. If Vigilant were liable for only the injury occurring during the policy period, it would avoid the holding in *Ames* that by breaching its duty to defend it waived its coverage defenses. We will not permit Vigilant to escape the holding of *Ames* in this way.[8]

 Finally, the court believes that the settlements should be shared equally as a matter of equity. Had St. Paul's coverage not existed and the insured himself settled the claims, by breaching its duty to defend Vigilant would have been liable for the full amount of the insured's settlements. *See Maneikis v. St. Paul Ins. Co.*, 655 F.2d 818 (7th Cir.1981) (insured's assignee entitled to recover full amount of $200,000 settlement from insurer breaching duty to defend, despite insurer's contention that some of the underlying acts occurred outside effective

7. Because we hold that the "other insurance" clauses are not applicable, we need not address whether the particular clauses at issue would require the carriers to split the settlements equally, as the district court held, or *pro rata* according to their policy limits, as Vigilant argues in the alternative.

8. The other cases Vigilant cites in arguing that it is liable only for damages occurring during the policy period are inapposite. Vigilant Br. 41-

46. In cases where a court apportions liability between two carriers with different policy terms, but both carriers participated in defending the insured, it may be appropriate to hold each carrier liable for only the injury occurring during its policy. Here, under *Ames*, once Vigilant breached its duty to defend, it waived its coverage defenses, and it cannot now argue that it is liable only for the injury occurring during its policy period.

dates of policy). It would not be fair for Vigilant to pay less than St. Paul where St. Paul met its duty to defend and Vigilant breached its duty. Vigilant has stipulated that the costs of defense and the settlements were reasonable. Vigilant would have been liable for the entire amount of the settlement had Collins not been insured with St. Paul, and it should not be better off than the carrier that met its duty. Both carriers should contribute equal amounts to the settlements.

In brief, Vigilant wasn't. Under North Carolina law, Vigilant breached its duty to defend Collins in the underlying actions. Having breached that duty, Vigilant cannot now argue that the underlying incidents occurred outside its policy period. St. Paul is entitled to recover from Vigilant one-half of the costs of defending Collins, as that sum was determined by the district court, and it may recover one-half of the costs of settling the Gwyns' claims. For the foregoing reasons, the district court's grant of summary judgment in favor of St. Paul is affirmed. The district court's denial of pre-judgment interest is reversed.

AFFIRMED IN PART AND REVERSED IN PART.