MRS. ALLIE CLYDE CLAY, Admx., v. STATE INSURANCE COMPANY OF INDIANAPOLIS.

(Filed 28 November, 1917.)

1. Insurance, Accident—Death by Violence—Third Persons.

Where a policy of life insurance provides for a double indemnity in case of death by accident, "exclusively and independent of all other cases," the word "accident" is construed as an unusual and unexpected occurrence, taking place without foresight or expectation of the insured, determined by reference to the facts as they may affect him; and the intentional killing of the insured by a third person does not alone withdraw the claim from the protection of the policy.

**2. Same—Insured the Aggressor—Murderous Assault.**

Where a policy of life insurance gives double indemnity if the death of the insured has been caused by "external, violent, and accidental means," no recovery can be had of the extra indemnity when such death is caused by the killing of the insured by a third person, and the insured was in the wrong in commencing the fight, and the aggressor, under such circumstances as would render a homicide likely as a result of his own misconduct.

**3. Same—Evidence.**

Where the insured, having announced that he would kill his adversary, attacked him with a deadly weapon—a pole 3 or 4 feet long—pursued him with a pistol, which he first fired, and in the ensuing fight was killed by his adversary's pistol, fired at close range or contact, it is held that the insurer is not liable under a policy covering death by "external, violent, and accidental means."

CIVIL ACTION, tried before *Allen, J.,* and a jury, at February Term, 1917, of BERTIE.

The action was to recover a double indemnity of $1,000 claimed on a policy of insurance on one George E. Clay, deceased, who was killed in a fight with one Sullivan on 2 April, 1915.

The policy, bearing date in 1909, and on which the premiums had been regularly paid, insured the life of said George E. Clay in the sum of $1,000 and contained a stipulation for double indemnity of $1,000, in terms as follows: "During the premium-paying period of this policy, and excluding any time while the same may be in force, as extended insurance, all premiums having been duly paid, and this policy being then in force, in the event of the death of the insured, resulting from bodily injury, sustained and effected directly through external, violent, and accidental means (suicide, sane or insane, not included), exclusively and independently of all other causes, provided such death shall occur within 90 days from the date of the accident, the company will pay to the beneficiary or beneficiaries hereunder, in addition to the amount otherwise due, the sum of $1,000."

The policy also contained a clause withdrawing certain cases from the risks covered by the policy, among them the following: "If the insured shall, whether sane or insane, die by his own hand or act, or die in consequence of the violation of law, within one year from the date hereof, this policy shall be null and void, and all payment therefor shall be forfeited."

On proof of death, duly made, the $1,000 principal insurance was paid, and received "without prejudice," and in this suit for double indemnity of $1,000 recovery was resisted by defendant company, on the ground "that the death of the insured was brought on by his own unlawful conduct in attacking one Sullivan with a deadly weapon, and that said death

was not the result of external, violent, and accidental means; suicide, sane or insane, not included, exclusively and independently of all other causes."

The testimony of an eye-witness bearing directly on the occurrence was as follows: "I knew the late George E. Clay. I don't know the exact date that he was killed. I was in about 20 steps of him when he was killed. I was in my lot and he was in the public road. He was shot by Mr. Lester Sullivan. That killed him. I could not tell you how long he lived after he was shot, but not, in my opinion, to exceed 5 minutes." Cross-examination: "I lived in that community and on the land I owned, in Bertie County. I am sometimes called Robert, or Bob. This occurrence between George E. Clay and Lester Sullivan took place in 20 steps of my lot. A man named Robert Peele was moving off of my place. He was moving himself and was going to another place he had rented. He had several teams, and among them Mrs. Felton's team and his father's team. Mr. Lester Sullivan was driving one of the carts— Mrs. Felton's cart. I was in my barn at first, shelling corn. I heard them talking in the road. Clay was using oaths and cursing Sullivan. 'I will kill you,' he said. I went out of the barn and into the lot, and when I stepped into the lot, out of the barn, I heard Clay say, 'I will kill you.' Sullivan was then standing with his arms folded across his breast, and Clay slapped him in the face with his hand. Clay then went and got a pole—a pea pole—about 3 or 4 feet long. Clay then struck at Sullivan with the pole, and Sullivan warded off the lick and grabbed Clay around the neck and was holding him. The next thing I heard was the report of the pistol, and I saw smoke from a pistol behind Sullivan. The two men were then right together. Then I saw Sullivan run his hand into his shirt bosom, pull out a pistol and put it against Clay's breast, and fire. The two shots came almost together. I could not say who shot the first pistol. I could not tell, from all the facts, who fired the first shot. I know there was smoke around Sullivan when the first shot went off. Sullivan then ran his hand into his shirt bosom and got out his pistol. I did not see Sullivan have a pistol until then. Clay did have a pistol in his hand. I was in 20 steps from where it occurred. I heard Sullivan tell Clay that he was friendly with him and to go off and let him alone; that he did not want to have any trouble. I did not see Sullivan take anything from Clay. I saw two pistols, and Clay had one and Sullivan one. The pea pole that Clay had was dropped in the road. I do not know what became of the pistol that Clay had. I saw Mr. Peele take it out of his hand. Four shots were fired—Sullivan shot three and somebody else shot the other one. I could not say exactly that I heard Clay say to Sullivan he could not move the household effects of Mr. Peele. I heard Clay say, 'I will kill you.'"

On issue submitted as to liability and amount, the court charged the jury, if they believed the evidence, to answer the issue "Yes, $1,000, with interest." Judgment for plaintiff, and defendant excepted and appealed.

*Pruden & Pruden, Gilliam & Davenport, and S. Brown Shepherd for plaintiff.*
*Winston & Matthews and H. S. McMichael for defendant.*

HOKE, J., after stating the case: We regard it as established by the numerous decisions on the subject that in case of accident insurance, as expressed in the general terms of this policy, the word "accident" should receive its ordinary and popular definition as an unusual and unexpected occurrence—one that takes place without the foresight or expectation of the person affected—and that in a given case the question is to be determined by reference to the facts as they may affect the holder of the policy, or rather the person insured. "An event which, under the circumstances, is unusual and unexpected by the person to whom it happens." Bomvier, 1883, as cited in *Lovelace v. Travelers' Protective Association,* 126 Mo., 104, and the cases, hold further that the intentional killing of the insured by a third person does not of itself, and without more, withdraw the claim from the protection of the policy. *Lovelace v. Travelers' Association, supra; Richards v. Travelers' Ins.,* 89 Cal., 170; *Warner v. Mutual Accident Ins. Co.,* 8 Utah, 431; *Supreme Council v. Garrigus,* 104 Ind., 133; *Ins. Co. v. Barrett,* 90 Tenn., 256; *Gresham v. Equitable Acc. Ins. Co.,* 87 Ga., 497; *Travelers' Ins. Co. v. McConkey,* 127 U. S., 661; Kerr on Ins., 381; Vance on Ins., 566.

When the death has occurred as the result of an affray or other breach of the peace, several of the decisions contain expressions to the effect that the right to recover depends on whether the insured was the aggressor or in the wrong, but, so far as examined, a careful perusal of these cases will disclose that this of itself is not the ultimate test of liability. In some of them, as in *Supreme Council v. Garrigus, supra,* recovery was allowed, the intimations suggested are in the nature of *obiter dicta.* In others, where recovery was denied, it was by reason of exceptions of more inclusive meaning than any which appear in this policy. Thus, in *Gresham v. Equitable, supra,* the insured having been killed in an affray, the policy exempted the company from liability for death or injury caused *by fighting.* In *Travelers' Insurance Co. v. McConkey,* 127 U. S., 661, the company was exempt if the death of the insured was caused by intentional injuries inflicted by the insured or *any other* person. But in policies without these or like specific and definite exceptions, and on facts calling for construction of insurance in case of death by "external, violent, and accidental means," without more, we hold that the true test

CLAY *v.* INSURANCE CO.

of liability in cases of this character is whether the insured, being in the wrong, was the aggressor, under circumstances that would render a homicide likely as the result of his own misconduct.

The position finds full and direct support in *Talifeiro v. Travelers' Protective Association,* 80 Fed., 368, where it was held "That a benefit certificate insured against death by accident does not cover a case where the assured was shot in a quarrel in which he was the aggressor and violently attacked his adversary with a pistol, accompanying the act with the exclamation that he must have revenge, and warning his adversary to put himself in shape." On such facts, *Thayer, J.,* delivering the opinion, said: "This can be regarded as in no other than an invitation to a deadly encounter, in which the deceased voluntarily put his life at stake and deliberately took the chances of getting killed. Where a person thus invites another to a deadly encounter, and does so voluntarily, his death, if he sustains a mortal wound, cannot be regarded as accidental by any definition of that term which has been heretofore adopted. It might as well be claimed that death is accidental when a man intentionally throws himself across a railroad track, or leaps from a high precipice, or swallows a deadly poison. It is possible that death may not follow from either of these acts, but death is the result that would naturally be expected, and if such is the result it is not accidental."

The facts being essentially similar, we regard this well-reasoned case as decisive of the present appeal, it appearing here that the insured announcing that he would kill his adversary, first wrongfully assaulted him with a pea pole 3 or 4 feet long, a deadly weapon, and pursued the fight with a pistol, which he first fired, and was then himself shot and killed. Such a homicide could in no sense be called accidental, but on the facts as they are now presented the death of one or both of the parties was not unlikely, and that of the insured was fully justified under the law.

On the argument plaintiff cited and very much relied on the case of *Lovelace v. Travelers' Protective Association,* 126 Mo., 104, *supra.* In that case the insured, entering a hotel about 11 o'clock at night with a view of becoming a guest, found a disorderly person in the office. He was a friend of the landlord, who was sick at the time, and he undertook to put the offender out of the office, and was shot and killed as a result. There had been no threat or display of deadly weapons, and there was nothing in the facts or attendant circumstances to indicate that a homicide would likely follow, and on such facts recovery was allowed.

The case, to our minds, is not inconsistent with our present decision, and the two seem very well to define and illustrate the dividing line by which the question of liability may be properly determined. In the Missouri case, though the deceased may have been the aggressor, the

attendant circumstances, as stated, did not show that a homicide was to be naturally expected, and permitting the inference that the same was accidental, a recovery was sustained. In our case the affray from the beginning took on the aspect of a deadly encounter, and, the deceased being the aggressor and in the wrong, the homicide could not be considered an accident.

For the error indicated, there will be a new trial of the issue, and if the facts in evidence are as now presented, the defendant is entitled to the instruction that if these facts are accepted by the jury, their verdict should be for defendant.

New trial.