GLADYS A. DAVIS v. COLONIAL LIFE & ACCIDENT INSURANCE
COMPANY

No. 7529SC391

(Filed 17 December 1975)

**Witnesses § 1— 12-year-old witness — understanding of "divine punishment" — testimony properly considered**

The trial court erred in determining that a 12-year-old child could not testify because of his lack of understanding of "divine punishment"; however, such error was not prejudicial since the judge tried the case without a jury, the court nevertheless allowed the child to testify for "purpose of appeal," and the judge considered all the evidence, including the testimony of the child, in making his findings.

APPEAL by defendant from *Friday, Judge.* Judgment entered 7 March 1975 in Superior Court, McDOWELL County. Heard in the Court of Appeals 4 September 1975.

This is an action to recover under an accidental death insurance policy issued by defendant. The insured died as a result of a gunshot wound. Plaintiff is the beneficiary. The benefits were payable if the loss resulted "directly, independently and exclusively of all other causes from bodily injury effected solely through external and accidental means." The only question before the court was whether death occurred under conditions covered by the policy. The judge heard the case without a jury and entered judgment for plaintiff.

The testimony of plaintiff tends to show she and her husband, the insured, were at home with their children on the night he was killed. The two had been arguing. The children went to bed about 9:15 p.m. Plaintiff and her husband retired to their bedroom about 9:30 p.m. and began arguing and fighting. Insured choked her, hit her with a flashlight and banged her head against the wall. She was thrown from the bed against the wall. About that time the lights in the bedroom came on and she saw her 11-year-old son standing in the doorway. The next thing she remembered was seeing her husband lying on the floor bleeding from the head. She called for an ambulance. She was with her husband in an ambulance when he died while being transferred from Marion to a hospital in Asheville.

Davis v. Insurance Co.

Plaintiff next called her son, then twelve years old as her second witness. The court then examined the child as follows:

"Q. What is your age Wayne?

A. 12 years old.

Q. What grade are you in?

A. Sixth grade.

Q. Wayne what does it mean when you put your hand on the Bible and swear to tell the truth?

A. To tell the truth.

Q. What will happen to you if you don't tell the truth?

A. You get in trouble.

Q. With whom?

A. My mamma.

Q. What else does it mean?

Q. Who will punish you if you don't tell the truth?

A. My mamma.

Q. Anyone else?

Q. Wayne what did you do when you were given your oath a few minutes ago? Did you put your hand on the Book?

A. Yes sir.

Q. What book was it then?

A. Bible.

Q. Do you know what the Bible is? Do you know what it is supposed to be?

A. Yes.

Q. What is it supposed to be?

A. God's word.

Q. Where did you learn that?

A. In church.

Davis v. Insurance Co.

Q. Do you go to church?

A. Used to.

Q. What church did you go to? Did you go with your family?

A. Yes.

Q. Did some of your brothers and sisters go?

A. Yes.

Q. How long has it been since you went? Can you tell me that?

A. No.

Q. When you put your hand on the Bible and swore to tell the truth, the whole truth, and nothing but the truth, by that then you can honestly tell the truth?

A. Yes.

Q. Is it your intention to tell the truth?

A. Yes.

Q. If you don't, do you expect to be punished?

A. Yes.

Q. Do you think that you might be punished by your mother? Did I understand you to say that?

A. Yes.

Q. Has she told you to tell the truth on this occasion?

A. Yes.

Q. Do you expect as a result of going to church to be punished by God if you don't tell the truth?

A. Yes.

Q. Do you expect to be punished by this court?

A. Yes.

Q. And it is your intention to tell the truth about it?

A. Yes.

Q. Do you know the difference between the truth and a lie?

A. Yes.

The court then declared:

"The court is not satisfied at this stage, from its own examination, and examination from the counsel, that the witness understands divine punishment. It is the ruling that the witness does not qualify to testify because of his lack of belief in the oath he has taken or the lack of understanding, particularly that section dealing with punishment by God if he does not tell the truth on the stand."

The court, nevertheless, then immediately allowed the child to be sworn and testify for "purpose of appeal." His testimony is as follows:

"I became 12 years old on August 4, 1974. I do not recall my father dying. I do recall the night my mother has testified about. I do remember going to bed that night and I will describe to the court what happened that night after I went to bed.

I went to bed about 11 and Mom and Daddy were arguing and then Daddy started beating on Mamma. Then I got up and cut the light on in the kitchen. I got the gun off the top of the freezer, I knew that was where the gun was because it was kept there. It was a .38 pistol. I had never shot that pistol before. My father had had that pistol for some time, but I have never handled it in any way. I had seen him use it. I had watched him shoot it and did know how it worked. After I got the pistol off the freezer, I took it out of the holster. I threw the holster down and went down and cut the hall light on. I then cut the bedroom light on. I could not see anything until that time. When I turned the light on in the bedroom, I saw Daddy on top of Mamma beating her. He throwed her out in the floor and he kicked her, he got up off the bed and started toward me. I told him to stop or I would shoot and he started running towards me. I shot him. I knew it had hit him in the head. I did not shoot him more than one time. I went back in the kitchen and just stood there. I laid the gun on the table. I did not go back to the room where Daddy was."

Plaintiff then rested and defendant's motion for involuntary dismissal was denied. Defendant then attempted to offer

the child's testimony, as previously given, as evidence for the defense. The court declared that it had already ruled that the child was incompetent to testify and duly noted defendant's exception. Defendant then rested and its renewed motion for involuntary dismissal was denied.

The court thereafter entered a judgment wherein, after reciting plaintiff's testimony, it made the following findings of fact:

"1. That John R. Davis, the insured, met his death on February 16, 1973, as a result of a gunshot wound;

2. That the widow did not hear a shot nor did she see the shooting;

3. That on the record, the shooting is unexplained;

4. That prior to the shooting, the insured had been engaged in an assault on his wife, a misdemeanor, and that this assault had apparently terminated when the bedroom light came on;

5. That Wayne Davis, 12 year old son of the insured and wife, turned the bedroom light on;

6. That deceased had no weapon of any type on his person at the time of his death."

The court then concluded that the insured's death was accidental within the meaning of the policy and entered judgment in favor of plaintiff for the amount due thereunder.

*Carnes & Rollins, by Everette C. Carnes, for plaintiff appellee.*

*Dameron & Burgin, by Charles E. Burgin, for defendant appellant.*

VAUGHN, Judge.

We note at the outset that there are no exceptions to the court's findings of fact. The facts so found are sufficient to support the conclusion that the insured's death was accidental within the meaning of the policy, i.e. it resulted from an unexplained gunshot wound.

Defendant's assignment of error directed to the court's failure to grant its motions for dismissal, "judgment notwith-

standing the verdict," a new trial and its exceptions to the entry of the judgment do not present the question of the sufficiency of the evidence to support the findings of fact made by the court.

Defendant brings forward an assignment of error based on the judge's ruling on the competency of the child as a witness. The trial judge was wrong when he said that the child could not testify because of his lack of understanding of "divine punishment." It clearly appears that the child expressed an understanding of his duty to tell the truth. He told the judge that if he did not tell the truth he expected to be punished by his mother, the court and by God. If he lacks understanding of the precise nature of the punishment to be expected from the latter, it is, perhaps, a dilemma shared by many who are much older than he is. Moreover, it is highly questionable whether a disqualification as a witness because of either lack of understanding of, or disbelief in divine punishment could, in proper case, withstand an attack on constitutional grounds.

The question now is whether the error prejudicially affected the outcome of the trial. The judge tried the case without a jury. He heard the child's testimony and it is in the record. He referred to the testimony in the judgment and makes, what might be called, alternative findings which are, in part, as follows:

> "The infant's testimony seems to establish that the insured had quit the assault on his wife, the infant's mother, when the bedroom light came on and was WALKING toward the infant. The evidence does not disclose for what reason the father did so. It would appear to be fair inference that the father intended to remove the dangerous weapon from the possession of the youth who was untrained in the use of firearms for the protection of the youth, his mother, or himself. It would not appear under any circumstances that the father expected the child to shoot him."

The quoted alternative finding explains the "unexplained gunshot wound" and discloses that it was the result of the intentional act of another. That the death wound on deceased was inflicted by the intentional act of another, standing alone, does not bar recovery under the terms of the policy before us. The policy does not have a clause excluding injury by the intentional act of another. *Bone v. Insurance Co.*, 10 N.C. App. 393, 179 S.E. 2d 171.

The judgment before us includes the following:

" 'In policies . . . calling for construction of insurance coverage case of death by 'external . . . and accidental means' . . . the true test of liability . . . is whether the insured, being in the wrong, was the aggressor, under such circumstances that would render a homicide likely as a result of his own misconduct.' CLAY v. INSURANCE CO., 174 N.C. 642. And in FALLINS v. INSURANCE CO., 247 N.C. 72, p. 75, the Court said, 'an injury is effected by accidental means if in the line of proximate cause the act, event or condition from the standpoint of the insured person is unintended, unexpected, unusual, or unknown, the unintended acts of the insured are deemed accidental. Injuries caused to the insured by the acts of another person without the consent of the insured are held due to accidental means unless the injurious acts are provoked and should have been expected by the insured.' "

*Clay v. Insurance Co., supra,* quoted in part by the trial judge, is cited as supporting the following:

"Despite some variety in the language used, the general rule is to the effect that the mere fact that a person insured against accidental injury or death voluntarily and wrongfully assaulted another will not be sufficient to characterize as nonaccidental all possible injuries which he receives in the course of or as a consequence of his attack, but such injuries may be regarded as accidental unless they were a natural or probable result of the insured's actions, reasonably foreseeable by him or by a reasonably prudent man in his position." 44 Am. Jur. 2d Insurance, § 1248, p. 93, n. 10.

As here, *Aetna Life Ins. Co. v. Beasley*, 272 Ala. 153, 130 So. 2d 178, involved a bedroom assault by a husband on his wife. The father was shot and killed by his 14-year-old son. The Alabama court affirmed recovery under a policy that provided benefits for loss of life sustained solely by accidental means. For other cases where death or injuries resulted from family fights, *see* Annot., 26 A.L.R. 2d 423 (1952).

The evidence in this case would permit the judge to find that the deceased was the aggressor in a bedroom fight with his wife. It would also permit the judge to find that deceased could not reasonably foresee that death by gunshot from

the hands of his 11-year-old son (who had already gone to bed) would be a natural or probable result of the altercation with his wife. The judge could properly find that the father advanced on the child only to remove a dangerous weapon from the hands of the child without any expectation that the child would intentionally shoot him. When the substance of the record before us is considered without undue regard to its form, it is perfectly obvious that these are the findings made by the trial judge and that he considered all of the evidence, including the testimony of the child.

The judgment is affirmed.

Affirmed.

Chief Judge BROCK and Judge MARTIN concur.