MAGNOLIA MANUFACTURING OF NORTH CAROLINA, INC., PLAINTIFF v. ERIE INSURANCE EXCHANGE, ERIE INSURANCE PROPERTY AND CASUALTY COMPANY, AND ERIE INSURANCE GROUP, DEFENDANTS

No. COA05-887

(Filed 5 September 2006)

**Insurance— loss of business income—proof of loss—accidental loss—cause of collapse**

The trial court properly denied summary judgment in favor of plaintiff company, but improperly granted it to defendant insurer on the issue of whether plaintiff suffered accidental loss of business income due to a roof collapse covered under plaintiff's insurance policy with defendant, because: (1) defendant waived its right to enforce plaintiff's strict compliance with the proof of loss provision in the insurance contract by denying liability on grounds not relating to the proofs during the period prescribed by the policy for the presentation of proofs of loss; (2) with regard to accidental loss, plaintiff offered evidence that it had no notice that work on the roof of the building in which plaintiff's business was located would result in roof collapses to the extent that it would require a complete vacating of the second floor for an extended period of time which was sufficient evidence of an accident to survive defendant's summary judgment motion; (3) plaintiff presented evidence that it lost the use of the second floor, and defendant, the moving party, presented no argument why that loss does not constitute loss or damage of plaintiff's property; (4) plaintiff offered evidence in the form of a deposition that the roof collapses were due to hidden decay as well as water damage, both covered under the pertinent policy; and (5) defendant

offered no authority requiring expert testimony to establish that one of the listed causes existed in this case, nor has it made any argument explaining why coverage could not be determined in the absence of expert testimony.

Judge TYSON dissenting.

Appeal by plaintiff from order entered 20 April 2005 by Judge Michael R. Morgan in Orange County Superior Court. Heard in the Court of Appeals 9 February 2006.

*The Brough Law Firm, by Robert E. Hornik, Jr., for plaintiff-appellant.*

*Bailey & Dixon, L.L.P., by David S. Coats, for defendants-appellees.*

GEER, Judge.

Plaintiff Magnolia Manufacturing of North Carolina, Inc. ("Magnolia") appeals from a grant of summary judgment in favor of defendants Erie Insurance Exchange, Erie Insurance Property and Casualty Company, and Erie Insurance Group (collectively "Erie"). Because we hold that genuine issues of material fact exist as to whether Magnolia suffered accidental loss of business income due to a roof collapse covered under Magnolia's insurance policy with Erie, we hold that summary judgment was improper.

Facts and Procedural History

Magnolia is a closely held North Carolina corporation founded in 1993 by Robin Dashman, the company's president. Magnolia's business involved the creation and sale of silk plants, florals, and trees to a national market. In 1996, in order to accommodate its growing business, Magnolia moved into a two-story building in Hillsborough, North Carolina, known as the Saratoga Mill building. The building was built in 1908 and was owned by the Hillsborough Owners Company ("HOC"). A year after moving into the second floor of the building, Magnolia expanded to take over the ground floor as well.

At that time, the second floor of the Saratoga Mill building had a dropped ceiling made of ceiling tile that was suspended from the bottom side of the wooden roof decking. Above the wooden decking was a roof membrane exposed to the outer air. In late 2000, Magnolia notified HOC that planks from the wooden roof decking were falling onto

the dropped ceiling and sometimes breaking through the dropped ceiling into the second floor working space. In response, HOC contracted with ADM Building Contractors, L.L.C., ("ADM") to repair the roof. ADM began work in January 2001 and quickly discovered that the roof was in much worse condition than anyone had originally anticipated. ADM recommended that the entire roof of the Saratoga Mill building be replaced.

After soliciting bids, HOC ultimately contracted with ADM to replace the roof. According to Magnolia's evidence, the original plan was for ADM to work across the roof in small sections, with Magnolia taking the precaution of moving second-floor inventory and equipment out from underneath the work as ADM progressed along the roof. Accordingly, in anticipation of the start of the work, Magnolia cleared out a portion of the second floor, including the break room, glass room, pour room, and acrylics department.

A day or two later, in late February 2001, ADM began the roof replacement. On the morning of the first day of work, a large portion of rotted wood roof planks fell through the dropped ceiling and into the break room, pulling down the interior wiring and lighting fixtures with the ceiling. No one was injured, and no inventory or equipment was damaged, but Dashman sent her employees home for the day.

The following business day, Magnolia moved all of its equipment and inventory out of the second floor. It also began to daily shift its equipment and inventory around on the first floor to stay out from underneath the path of construction. Over the course of the spring of 2001, as ADM moved across the roof in the course of replacing it, rotted wood continued to fall into the building. Dashman estimated that there were about 40 separate instances of wood planks falling onto or through the dropped ceiling onto the second floor. Sometimes, only a few planks would fall through at once, and other times, the ceiling of an entire room would crash down.

ADM finished the new roof decking and outer membrane by April 2001. The associated electrical work, rehanging of the dropped ceiling, and refinishing of the interior of the second floor was not complete until August 2001. Although HOC paid for the roof replacement, Magnolia paid for most of the refitting of the second floor.

From January to August 2001, Magnolia's productivity went into decline. According to an affidavit from Dashman:

As a result of the roof collapse, Magnolia's production capability was crippled. We lost time moving the second floor operations to the first floor. Then, as the roof replacement project progressed, we had to shuffle material and equipment on the first floor to protect it from dirt and debris which managed to fall or otherwise migrate from the second floor to the first floor. Magnolia's staff spent so much time moving equipment and materials, that we could not fill orders fast enough to satisfy our customers. As we lost customers, I had to lay off experienced personnel. By mid-to-late June 2001, Magnolia had only a skeleton crew working to fill the few remaining orders we had.

Throughout the relevant time period, Magnolia was covered by an "Ultrapack Business Policy" from Erie. In early March 2001, as ADM was in the process of replacing the old roof, Dashman contacted Erie's agent over the telephone to file a loss of income claim under the policy. Soon afterwards, a representative from Erie photographed the premises. On 14 March 2001, Dashman received a letter from David Smeltz, a senior property claims specialist at Erie, stating that Erie was denying Magnolia's claim because "the loss of income is being caused by the work being conducted by the contractor which is excluded under the policy."

In September 2001, Magnolia hired the entire sales force of a competitor. In October 2001, it opened a new showroom that was triple the size of the old one. In February 2002, Magnolia terminated its lease with HOC and moved its business out of the Saratoga Mill building and into a new location in Efland, North Carolina. Despite these efforts to revive and expand its business, by the end of 2002 Magnolia was no longer in operation. In early 2003, it filed for bankruptcy.

During this time period, Magnolia continued to request indemnification from Erie for its income losses. In September 2001, Erie denied coverage in a telephone conversation with Magnolia's attorney, on the grounds that no collapse covered by Magnolia's policy had taken place. After this September phone call, the next recorded contact between the parties is a letter from Erie dated 5 February 2002 that stated:

The original notice of claim [for loss of income] was investigated and determined to be outside the coverage provided.

. . . No damages have been presented for our consideration of . . . any claim for loss of business income.

MAGNOLIA MFG. OF N.C., INC. v. ERIE INS. EXCH.

[179 N.C. App. 267 (2006)]

. . . In order to trigger business income protection, [policyholders] must first sustain damage resulting from a covered peril.

The letter also referenced Magnolia's apparent lack of any business personal property losses and stated, "I am enclosing a Proof of Loss form for Mrs. Dashman to complete should she wish to present further claims for consideration." Magnolia did not respond to this letter or to a 1 April 2002 letter, enclosing another Proof of Loss form and stating that if Erie did not hear from Magnolia in the near future, it would assume Magnolia had no further claims and close the outstanding claim.

Magnolia filed a complaint against Erie on 12 January 2004. Ultimately, the parties filed cross-motions for summary judgment. On 20 April 2005, the trial court denied Magnolia's motion and granted Erie's motion. Magnolia filed a timely appeal to this Court.[1]

### Discussion

"This Court's standard of review on appeal of summary judgment is well-established. Summary judgment is properly granted if considering the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, there is no genuine issue of material fact and a party is entitled to judgment as a matter of law." *Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 393-94, 499 S.E.2d 772, 775 (1998). "The moving party bears the burden of showing the lack of triable issue of fact. . . . Once the moving party meets its burden, the [nonmoving party] must produce a forecast of evidence demonstrating that the nonmoving party will be able to make out at least a prima facie case at trial. The evidence is to be viewed in the light most favorable to the nonmoving party." *Id.* at 94, 499 S.E.2d at 775 (alteration in original) (internal quotation marks and citation omitted).

In this case, Erie contends that the trial court properly granted summary judgment because (1) Magnolia failed to comply with the insurance policy's requirement that it file a proof of loss form, and (2) it failed to establish that it suffered an accidental loss as a result of a collapse due to a covered reason. Magnolia, on the other hand, contends that Erie waived the proof of loss requirement and that

---

1. We note that the statement of facts in defendants' brief is composed primarily of a single-spaced "factual chronology." That portion of the brief violates N.C.R. App. P. 26(g)(1) (providing that, for all "[p]apers presented to either appellate court," "[t]he body of text shall be presented with double spacing between each line of text").

genuine issues of material fact exist as to whether the following policy provision entitled Magnolia to recovery under its Ultrapack Business Policy:

> We do not cover . . . loss caused directly or indirectly . . . by collapse. We will cover loss from collapse caused by fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism or malicious mischief; breakage of building glass; falling objects; weight of snow, ice, or sleet; water damage; hidden decay; hidden insect or vermin damage; sprinkler leakage; sinkhole collapse; volcanic action; weight of people or personal property; weight of rain that collects on a roof; or use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation.

I. Proof of Loss Requirement

It is well-established in North Carolina that an insurance contract provision requiring the insured party to file a proof of loss with the insurance carrier should be construed as existing for the benefit of the insurer. *Brandon v. Nationwide Mut. Fire Ins. Co.*, 301 N.C. 366, 370-71, 271 S.E.2d 380, 383 (1980). An insurer may "be found to have waived a provision or condition in an insurance policy which is for its own benefit." *Id.* at 370, 271 S.E.2d at 383. *See also Hicks v. Home Sec. Life Ins. Co.*, 226 N.C. 614, 616-17, 39 S.E.2d 914, 915-16 (1946) (holding that life insurance company waived its right to enforce provision that insured could not hold more than one policy at once from the same company).

Our courts have found that the proof of loss requirement may be waived " 'by any conduct on the part of the insurer or its authorized agent inconsistent with an intention to enforce a strict compliance with the insurance contract in such regard.' " *Brandon*, 301 N.C. at 370-71, 271 S.E.2d at 383 (quoting 44 Am. Jur. 2d *Insurance* § 1509 (1969)). Specifically, "[a] well-recognized situation giving rise to a justifiable claim of waiver . . . occurs when the insurer denies liability, on grounds not relating to the proofs, during the period prescribed by the policy for the presentation of proofs of loss." *Id.* at 371, 271 S.E.2d at 383-84 (holding that issue of fact existed as to whether insurance company had waived right to enforce proof of loss requirement when company repeatedly rejected insured's incomplete proof of loss forms, without telling the insured its grounds for rejecting his claim). *See also Gerringer v. N.C. Home Ins. Co.*, 133 N.C. 407, 414-15, 45

S.E. 773, 776 (1903) ("A distinct denial of liability and refusal to pay on the ground that there is no contract, or that there is no liability, is a waiver of the condition requiring proofs of loss." (internal quotation marks omitted)). This rule exists because a denial of a claim "is equivalent to a declaration that [the insurer] will not pay, though the proofs be furnished; and to require the presentation of proofs in such a case, when it can be of no importance to either party, and the conduct of the party in whose favor the stipulation is made has rendered it practically superfluous, is but an idle formality, the observance of which the law will not require." *Id.* at 415, 45 S.E. at 776 (internal quotation marks omitted).

Although, generally, " '[w]aiver is a mixed question of law and fact[, w]hen the facts are determined, it becomes a question of law.' " *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 575, 589 S.E.2d 423, 428 (2003) (alterations in original) (quoting *Hicks*, 226 N.C. at 619, 39 S.E.2d at 918), *disc. review denied sub nom. Santomassimo v. Valley Forge Life Ins. Co.*, 358 N.C. 377, 598 S.E.2d 138 (2004). In the present case, according to the terms of the insurance contract, Magnolia had 90 days from the date of its loss to file a signed and sworn proof of loss statement. It is undisputed that Erie denied Magnolia's claim for loss of income in writing on 14 March 2001, about two weeks after Dashman telephoned regarding the claim and well within the 90-day period. In case there was any mistake as to the 14 March 2001 denial, Erie also repeated its denial of the claim by phone in September 2001 and, again, by letter in February 2002. As reasons for its denial, Erie relied upon the absence of a covered peril, the same ground relied upon by Erie before the trial court and this Court.

Thus, the uncontroverted facts indicate that Erie "denie[d] liability, on grounds not relating to the proofs, during the period prescribed by the policy for the presentation of proofs of loss." *Brandon*, 301 N.C. at 371, 271 S.E.2d at 383-84. Filing proofs of loss would have been an act of futility in light of the specificity of the denials of coverage. Accordingly, Erie waived its right to enforce Magnolia's strict compliance with the proof of loss provision in the insurance contract. Magnolia is thus not barred from litigating its claims under the contract.

II. Accidental Loss

Magnolia's policy states that Erie will cover "loss from collapse." The policy defines "loss" as "direct and accidental loss of or damage

to insured property." Erie contends first that any "collapse" that may have taken place was not an accident, but rather was foreseeable as the natural result of ADM's roof repair. Magnolia, however, contends that the magnitude of the roof collapses, rendering the second floor workspace unusable, were unforeseeable to it and, therefore, constituted an accidental loss.

In the context of accident insurance, our Supreme Court has defined an "accident" as "an unplanned and unforeseen happening or event, usually with unfortunate consequences." *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 302, 524 S.E.2d 558, 564 (2000). *See also Clay v. State Ins. Co. of Indianapolis*, 174 N.C. 642, 645, 94 S.E. 289, 290 (1917) (defining an accident as "an unusual and unexpected occurrence—one that takes place without the foresight or expectation of the person affected[;] . . . [a]n event which, under the circumstances, is unusual and unexpected by the person to whom it happens" (internal quotation marks omitted)). The Court has also stated, in the context of an accidental death insurance policy:

> An injury is "effected by accidental means" if in the line of proximate causation the act, event, or condition from the standpoint of the insured person is unintended, unexpected, unusual, or unknown. . . . Injuries caused to the insured by the acts of another person, without the consent of the insured, are held due to accidental means unless the injurious acts are provoked and should have been expected by the insured.

*Fallins v. Durham Life Ins. Co.*, 247 N.C. 72, 75, 100 S.E.2d 214, 217 (1957). In *Pleasant v. Motors Ins. Co.*, 280 N.C. 100, 102, 185 S.E.2d 164, 166 (1971), the Court further stressed that "whatever is unexpected or unforeseen is determined from the standpoint of the named insured in the policy."

The question in this case is thus whether the collapses were "unexpected or unforeseen" by Magnolia. While Magnolia offered evidence that it knew some material might fall to the floor from the ceiling during ADM's roof repair, it also offered evidence that the company did not expect that entire portions of the roof would collapse into the second floor workspace, bringing down the electrical wires and lighting with the falling roof, rendering the entire second floor unusable, and disrupting work on the first floor.

Dashman testified that Magnolia had expected only that it would have to reposition its equipment and work around the second floor

so that it was not directly under ADM's work. Dashman explained, however, that, on the first day that the roof replacement project began, she and the other Magnolia employees were forced to halt work and move all inventory and equipment from the second floor to the first floor of the Saratoga Mill building—actions indicating that they failed to anticipate possible roof collapses ahead of time. While Erie points to an affidavit of Allen D. Myers of ADM that the roofing project was "completed timely and without incident," that affidavit gives rise to an issue of fact and cannot establish that Erie is entitled to summary judgment. *See Ward v. Durham Life Ins. Co.*, 325 N.C. 202, 209, 381 S.E.2d 698, 702 (1989) (" 'In ruling on summary judgment, a court does not resolve questions of fact but determines whether there is a genuine issue of material fact.' " (quoting *Dickens v. Puryear*, 302 N.C. 437, 453, 276 S.E.2d 325, 335 (1981)).

Erie also argues that *Bagelman's Best, Inc. v. Nationwide Mut. Ins. Co.*, 167 N.C. App. 370, 605 S.E.2d 266, 2004 N.C. App. LEXIS 2126, 2004 WL 2793214 (2004) (unpublished), supports its position that no accident occurred. There, we decided that an insured was not entitled to coverage for lost business income from a five-day power loss that was announced ahead of time by the power company, because that loss was not unexpected by the insured and therefore was not "accidental."

We note initially that unpublished opinions are not controlling authority. *Erie Ins. Exch. v. Miller*, 160 N.C. App. 217, 222, 584 S.E.2d 857, 860 (2003). *See also* N.C.R. App. P. 30(e)(3) ("An unpublished decision of the North Carolina Court of Appeals does not constitute controlling legal authority."). Further, while the plaintiff in *Bagelman's Best* knew in advance that it would suffer a complete loss of power for five days, Magnolia offered evidence that it had no notice that the roof work would result in roof collapses to the extent that it would require a complete vacating of the second floor for an extended period of time. *See Am. Mfrs. Mut. Ins. Co. v. Morgan*, 147 N.C. App. 438, 441, 556 S.E.2d 25, 28 (2001) (holding in the insurance context that an "accident" includes an intentional act if the injury is not intentional or substantially certain to be the result of the intentional act), *cert. denied*, 355 N.C. 747, 565 S.E.2d 191 (2002).

We hold that Magnolia has forecast sufficient evidence of an accident to survive Erie's summary judgment motion. Erie, however, argues further that any accident did not result in a covered loss because there was no loss or damage to Magnolia's personal property

or inventory. The policy defines "property damage" to include "loss of use of tangible property which is not physically injured or destroyed." Magnolia has presented evidence that it lost the use of the second floor, and Erie, the moving party, has presented no argument why that loss does not constitute loss or damage to Magnolia's property. This argument, therefore, is not a sufficient basis for upholding the trial court's grant of summary judgment.

III. Cause of the Collapse

Erie also denied coverage on the grounds that, even if an accidental collapse occurred, Magnolia has failed to demonstrate that the collapse resulted from a cause covered by the policy. Magnolia, however, offered evidence in the form of Dashman's deposition that the roof collapses were due to hidden decay as well as water damage, both covered under the Ultrapack policy. In addition, an affidavit from Dashman stated: "When ADM started to remove the roof membrane on the top side of the roof, the rotted wood decking below the membrane seemed to disintegrate and break apart. . . . As far as I know, nobody was aware of exactly how bad the decay of the roof-decking was until ADM was tearing off the roof membrane beginning in late February 2001." (Emphasis original.) Finally, Erie submitted to the court a photograph bearing the caption, "Old roof decking showing signs of rot."

While Erie asserts that Magnolia "has not identified any contractor or other expert to opine that [one of the covered causes] was the cause of this alleged collapse," it has cited no authority requiring expert testimony to establish that one of the listed causes existed in this case. Nor has it made any argument explaining why coverage could not be determined in the absence of expert testimony. Indeed, there appears to be no dispute that the deterioration of the roof decking was due to decay and water damage. While a case might arise in which expert testimony would be required, Erie, the moving party, has failed to demonstrate that it is necessary in this case. We, therefore, conclude that Magnolia has presented sufficient evidence to survive summary judgment as to whether the roof collapse was the result of a cause covered under the policy.

Conclusion

To summarize, in light of the many conflicting factual issues presented by both parties' affidavits, depositions, and other evidence, we are of the opinion that this case cannot be resolved at the sum-

mary judgment stage. We hold that the trial court properly denied summary judgment to Magnolia, but improperly granted it to Erie. This case is, accordingly, remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Judge HUDSON concurs.

Judge TYSON dissents in a separate opinion.

TYSON, Judge dissenting.

The majority's opinion reverses the trial court's grant of summary judgment for defendants and holds plaintiff's allegations presented a genuine issue of material fact. The majority's opinion ignores the plain and unambiguous meaning of the provision of the insurance contract between the parties. I vote to affirm the trial court's order and respectfully dissent.

## I.  Standard of Review

The movant of a motion for summary judgment bears the burden to establish no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *Hines v. Yates*, 171 N.C. App. 150, 157, 614 S.E.2d 385, 389 (2005). The movant can meet this burden by either: 1) proving that an essential element of the opposing party's claim is nonexistent or 2) showing through discovery that the opposing party cannot produce evidence sufficient to support an essential element of his claim nor [evidence] sufficient to surmount an affirmative defense to his claim. *Id.*

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

*Id.*; *see* N.C.R. Civ. P. 56(c) (2005). "On appeal, an order allowing summary judgment is reviewed *de novo*." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004).

## II.  Contract Interpretation

"The interpretation of language used in an insurance policy is a question of law, governed by well-established rules of construction." *N.C. Farm Bureau Mut. Ins. Co. v. Mizell,* 138 N.C. App. 530, 532, 530 S.E.2d 93, 95, *disc. rev. denied,* 352 N.C. 590, 544 S.E.2d 783 (2000). " 'An insurance policy is a contract and its provisions govern the rights and duties of the parties thereto.' " *Herring v. Liner,* 163 N.C. App. 534, 538, 594 S.E.2d 117, 120 (2004) (quoting *Gaston County Dyeing Machine Co. v. Northfield Ins. Co.,* 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000)). "The language in the policy is to be construed as written 'without rewriting the contract or disregarding the express language used.' " *Id.* (quoting *Fidelity Bankers Life Ins. Co. v. Dortch,* 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986)).

The Court determines whether coverage exists under an insurance policy for a claim by examining the four corners of the complaint in the underlying action to determine whether the allegations contained in the claim are covered under the plain and ordinary language used in the policy. *See Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986). " 'Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended.' " *Herring,* 163 N.C. App. at 538, 594 S.E.2d at 120 (quoting *Gaston County Dyeing Machine Co.,* 351 N.C. at 299, 524 S.E.2d at 563). "When we [are required to] construe provisions of an insurance policy, 'the goal of construction is to arrive at the intent of the parties when the policy was issued.' " *Id.* (quoting *Woods v. Insurance Co.,* 295 N.C. 500, 505, 246 S.E.2d 773, 777 (1978)).

" 'Provisions which exclude liability of insurance companies are not favored and therefore all ambiguous provisions will be construed against the insurer . . . .' " *Id.* (quoting *State Capital Ins. Co. v. Nationwide Mutual Ins. Co.,* 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986)). " 'Exclusions from, conditions upon and limitations of undertakings by the [insurance] company, otherwise contained in the policy, are . . . construed strictly . . . to provide coverage.' " *Herring,* 163 N.C. App. at 538, 594 S.E.2d at 120·(quoting *Trust Co. v. Insurance Co.,* 276 N.C. 348, 355, 172 S.E.2d 518, 522-23 (1970)).

The insurance contract between the parties at bar states:

MAGNOLIA MFG. OF N.C., INC. v. ERIE INS. EXCH.

[179 N.C. App. 267 (2006)]

We do not cover . . . loss caused directly or indirectly regardless of any cause or event contributing concurrently or in any sequence to the loss:

. . . .

8. by collapse. We will cover loss from collapse caused by fire; lightening; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism or malicious mischief; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; hidden decay; hidden insect or vermin damage; sprinkler leakage; sinkhole collapse; volcanic action; weight of people or personal property; weight of rain that collects on a roof; or use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Any damage plaintiff suffered from a "collapse" is expressly excluded from coverage unless plaintiff proves her claim fits into the enumerated exceptions.

Plaintiff alleges in her affidavit that "a portion of the roof of the second story of the building collapsed into the second story of the building." Under the contract's plain and unambiguous language, loss caused directly or indirectly from collapse is expressly excluded from coverage. Under plaintiff's own sworn admissions, its claim is not a covered loss under the contract.

Plaintiff failed to present any evidence that its loss resulted from one of the exceptions to the collapse exclusion. In an affidavit, Allen D. Myers, Managing Member of ADM Building Contractors, L.L.C., stated:

> [p]rior to the Roof Repair Project, the roof had not collapsed in any manner but was in poor condition and in need of repair . . . . During the course of the Roof Repair Project, ADM took down portions of the old roof and put in a new roof. ADM was able to assist [plaintiff] during the Roof Repair Project to help ensure that Magnolia sustained no damage to any of their inventory or personal property.

(Emphasis supplied). It is undisputed that plaintiff's loss did not occur until ADM began construction to replace the roof. Under the contract's plain and unambiguous language, plaintiff's loss is excluded.

On 14 March 2001, defendants denied plaintiff's claim because: (1) the contract excluded plaintiff's claim and (2) plaintiff's loss was caused by the contractor's work on the roof. Exclusions numbered 4 and 12 in the insurance contract state, in pertinent parts:

We do not cover . . . loss caused directly or indirectly regardless of any cause or event contributing concurrently or in any sequence to the loss:

. . . .

12. by faulty, inadequate, or defective

. . . .

b. design, development of specifications, workmanship, construction;

. . . .

d. maintenance;

of property whether on or off the insured premises by anyone.

We do not cover . . . loss caused:

. . . .

4. to the interior of the building or the contents by rain, snow, sand, or dust, whether driven by wind or not, unless the exterior of the building first sustains damage to its roof or walls by a covered loss. We will pay for loss caused by or resulting from the thawing of snow, sleet, or ice on the building.

As Myers's uncontradicted affidavit shows, the roof on the building plaintiff leased had not "collapsed" and plaintiff suffered no covered losses prior to the commencement of work on the "Roof Repair Project." Myers testified the roof was in "poor condition" and "in need of repair." Undisputed evidence shows plaintiff's losses were caused by a poorly maintained roof and during the work to repair or replace it. Construing the contract's plain and unambiguous language, losses caused by collapse, faulty or inadequate maintenance, or construction are expressly excluded from coverage.

Defendants incurred no liability under the policy for plaintiff's loss. These losses occurred and resulted for activities expressly excluded from coverage. Plaintiff's loss is also expressly excluded

HICKORY ORTHOPAEDIC CTR., P.A. v. NICKS

[179 N.C. App. 281 (2006)]

under contract exclusion numbered 4. Reviewing plain and unambiguous provisions contained in the four corners of the contract, plaintiff's loss is excluded from coverage. The trial court properly granted summary judgment in favor of defendants.

## III.  Conclusion

Plaintiff failed to present any genuine issue of material fact. The contract's plain language expressly excludes coverage for its losses. The trial court "declared that the insurance policy issued to [p]laintiff which is the subject matter of this action provides no insurance coverage for the claims alleged by [p]laintiff in this action[.]" The trial court properly granted summary judgment in favor of defendants. I vote to affirm and respectfully dissent.