IN THE SUPREME COURT OF NORTH CAROLINA

No. 227A22

Filed 15 December 2023

NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC.

v.

CASSIE HERRING and CURTIS LEE TURMAN and RUTH HERRING

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 284 N.C. App. 334 (2022), affirming an order entered on 15 October 2021 by Judge G. Bryan Collins in Superior Court, Wake County. Heard in the Supreme Court on 14 September 2023.

*Haywood, Denny & Miller, LLP, by Robert E. Levin and Frank W. Bullock, III, for plaintiff-appellant.*

*Martin & Jones, PLLC, by Huntington M. Willis for defendant-appellees.*

ALLEN, Justice.

In upholding the trial court's order granting summary judgment for defendants, the Court of Appeals determined that defendant Cassie Herring (Cassie) resides with her mother and stepfather and thus qualifies for benefits under their automobile insurance policy. Because the evidence raises genuine issues of material fact about Cassie's residency, we reverse the judgment of the Court of Appeals and remand this case for further proceedings.

-1-

On 19 April 2019, Cassie was injured in a two-automobile collision in the Town of Wendell in Wake County while riding with her father, Franklin Herring, in his vehicle. The accident left Cassie with fractured ribs, injuries to her face and jaw, and a shattered knee. The driver of the other car was insured, and her insurance company ultimately tendered $100,000.00—the policy's limit per individual—to Cassie.

Cassie's mother, defendant Ruth Herring, and stepfather, defendant Curtis Lee Turman, maintained a personal automobile policy issued by plaintiff North Carolina Farm Bureau Mutual Insurance Company (Farm Bureau) for the period of 22 February 2019 to 22 August 2019. The policy included underinsured motorist (UIM) coverage of up to $100,000.00 per person payable to "an insured [who] is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of . . . bodily injury sustained by an insured and caused by an accident." The policy defined "insured" to include "any family member" of the named insureds (Ruth Herring and Curtis Lee Turman) and defined "family member" as "a person related to [a named insured] by blood, marriage or adoption who is a resident of [the named insured's] household." The policy did not define the term "resident."

On 26 May 2020, Cassie filed a lawsuit in the Superior Court, Wake County, seeking benefits under the Farm Bureau policy's UIM coverage. On 12 August 2020, the trial court entered a consent order staying the lawsuit so that the parties could participate in arbitration.

Prior to arbitration, and with her legal counsel in attendance, Cassie disclosed the following information while testifying under oath in an examination conducted by Farm Bureau's legal counsel. Afflicted by anxiety and bipolar disorder, Cassie was unemployed at the time of her accident and had worked only sporadically since graduating from high school in 2003. Her parents divorced in 2006, after which Cassie and her father lived alone in the Town of Knightdale in Wake County for about ten years. She and her father then moved to her father's current home near the border of Wake and Johnston Counties. Cassie gave her father's address as her home address when obtaining a driver's license and registering to vote. She received all her mail, including bank statements and bills, at her father's address. Cassie used her father's address when purchasing her car and paying property taxes on the car. She saw a doctor and a dentist whose offices were located within a few miles of her father's home.

In 2007 Cassie's mother and stepfather took up residence in Bahama, an unincorporated community in Durham County. During the approximately five-year period between her move to her father's present home and the accident, Cassie would travel to her mother's home a couple of times each week. She sometimes visited for the day, but other times she stayed overnight. Cassie had a room at her mother's house and occasionally kept clothes there. She could not specify how many times per month she stayed overnight at her mother's home in 2019, though Cassie estimated that "all of the days" she spent there that year "probably" equaled roughly four

months. When asked whether her mother supported her financially, Cassie responded, "My mom is on disability." She later added, though, that she was on her mother's cell phone plan. Cassie denied receiving any mail at her mother's home in 2019 or using her mother's address for any official correspondence.

On 2 December 2020, several days before the scheduled arbitration, Farm Bureau filed this action in the Superior Court, Wake County, seeking a judicial declaration that Cassie was not entitled to UIM coverage because, at the time of the accident, she lived with her father and "was not a resident of the household of Curtis Lee Turman and Ruth Herring." Farm Bureau subsequently filed a motion for summary judgment on its declaratory judgment claim based on Cassie's testimony.

Defendants responded with their own summary judgment motion, supported by affidavits executed by defendants and Cassie's father. Each affidavit asserted that Cassie maintained a split residence, dividing her time between her father's home and the home of her mother and stepfather. The affidavits alleged that long-term severe depression and anxiety disorder have impaired Cassie's ability to live independently. In their affidavits, Cassie's mother and stepfather further alleged that Cassie was listed as a driver on their automobile insurance policy and that she stored items at her mother's home, including "items of daily living such as clothing, toiletries, and bedding." All four affidavits claimed that Cassie "routinely" received mail at her mother's address.

On 15 October 2021, the trial court entered an order denying Farm Bureau's motion for summary judgment but granting defendants' motion. Farm Bureau timely appealed.

A divided panel of the Court of Appeals affirmed the trial court's order. *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 284 N.C. App. 334, 339 (2022). The majority "examine[d] the record to determine if, under any reasonable construction of the term, [Cassie] may be considered a 'resident' of her mother's household" and concluded that "at the very least" Cassie could establish that she maintained a split residency between the two homes. *Id.* at 338. The dissenting judge would have held that summary judgment was inappropriate because a genuine issue of fact existed as to whether Cassie was a resident of her mother's home. *Id.* at 343 (Dillon, J., dissenting). The dissenting judge argued that certain statements in Cassie's testimony could lead a jury to find that Cassie "is part of her father's household and merely visits her mother." *Id.* at 342–43.

On 26 July 2022, Farm Bureau filed a notice of appeal with this Court based on the dissent in the Court of Appeals. Although it has since been repealed, N.C.G.S. § 7A-30(2) then provided a right of appeal to this Court "from any decision of the Court of Appeals rendered in a case . . . [i]n which there is a dissent when the Court of Appeals is sitting in a panel of three judges." N.C.G.S. § 7A-30(2) (2021), *repealed by* An Act to Make Base Budget Appropriations for Current Operations of State Agencies, Departments, and Institutions, S.L. 2023-134, § 16.21.(d)–(e),

https://www.ncleg.gov/Sessions/2023/Bills/House/PDF/H259v7.pdf.

The only issue before this Court is whether the Court of Appeals erred in affirming summary judgment for defendants.[1] "We review de novo an appeal of a summary judgment order." *N.C. Farm Bureau Mut. Ins. Co. v. Martin*, 376 N.C. 280, 285 (2020). When reviewing a matter de novo, this Court "considers the matter anew and freely substitutes its own judgment" for that of the lower courts. *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647 (2003).

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2021). "An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action . . . . The issue is denominated 'genuine' if it may be maintained by substantial evidence." *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972). "A ruling on a motion for summary judgment must consider the evidence in the light most favorable to the non-movant, drawing all inferences in the non-movant's favor." *Morrell v.*

---

[1] In their brief to this Court, defendants additionally argue that Farm Bureau waived its right to decline coverage by, *inter alia*, paying Cassie $5,000.00 under the policy's no-fault medical payments coverage. Although the dissenting judge in the Court of Appeals addressed this issue, the majority expressed no view on it. *Herring*, 284 N.C. App. at 343–44 (Dillon, J., dissenting). Accordingly, the issue is not properly before this Court. *See State v. McKoy*, 385 N.C. 88, 94 (2023) ("When a case comes to us under N.C.G.S. § 7A-30(2) based solely on a dissent in the Court of Appeals, the scope of review is limited to those questions on which there was division in the intermediate appellate court." (internal quotation marks and citation omitted)).

*Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018).

In the context of an insurance coverage dispute, summary judgment "is appropriate . . . where the material facts and the relevant language of the policy are not in dispute and the sole point of contention is 'whether events as alleged in the pleadings and papers before the court are covered by the policies.' " *Martin*, 376 N.C. at 285 (quoting *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 690–91 (1986)). "The party seeking coverage under an insurance policy bears the burden 'to allege and prove coverage.' " *Id.* (quoting *Brevard v. State Farm Mut. Auto. Ins. Co.*, 262 N.C. 458, 461 (1964)).

"As with all contracts, the goal of construction [of an insurance policy] is to arrive at the intent of the parties when the policy was issued." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505 (1978). "If no definition [of a term used in the policy] is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Id.* at 506. When the meaning of a term "is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder." *Id.* In other words, we will construe ambiguous terms in favor of coverage. *Martin*, 376 N.C. at 286.

"[T]his Court has struggled in attempting to formulate a precise definition of the term 'resident' in connection with an insurance policy." *Id.* at 288. Nonetheless, consistent with our preference for extending coverage, we have construed the term to

encompass a variety of living arrangements. *See, e.g., Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430 (1966) (holding that an adult son who had recently moved back in with his father qualified as a resident of his father's household under his father's automobile insurance policy); *Barker v. Iowa Mut. Ins. Co.*, 241 N.C. 397 (1955) (holding that a nineteen-year-old college student who lived in an apartment near campus remained a resident of his father's household for purposes of his father's fire insurance policy).

On the other hand, we have explained that an individual cannot qualify as a resident of an insured relative's household unless he can show that he "actually lived in the same dwelling as the insured relative for a meaningful period of time." *Martin*, 376 N.C. at 291; *see also id.* at 284, 294 (discerning no intent on the part of the policy holder and her granddaughter and daughter-in-law to form a common household even though the granddaughter and daughter-in-law (1) lived in a guest house located on the policy holder's farm and within one hundred feet of the policy holder's house; (2) visited the policy holder almost every day and occasionally stayed with her overnight; (3) possessed keys to the policy holder's house and enjoyed "unlimited access to enter her residence"; and (4) had many of their living expenses paid for by the policy holder out of the farm's business account).

Under this Court's decision in *Martin*, "the question [is] whether the party seeking coverage ha[s] stayed in the insured family member's residence on more than merely a temporary basis *and* whether the facts support[] a finding that the family

members intended to form a common household." *Id.* at 292 (emphasis added). Answering this two-part question "can require a particularized, fact-intensive inquiry into the circumstances of the parties' current and prior living arrangements." *Id.* at 291.

Based on the record before us, the trial court should have denied defendants' motion for summary judgment. Even if an adult may be considered a resident of more than one household for purposes of the policy's UIM coverage,[2] the available evidence when viewed in the light most favorable to Farm Bureau—the nonmoving party— raises genuine issues of material fact as to whether Cassie was a resident of her mother's household at the time of the accident.

The Court of Appeals affirmed summary judgment for defendants largely because, according to the majority, Cassie testified that she "lives in her mother's home for 'four months out of the year,' an arrangement that she has 'always' had." *Herring*, 284 N.C. App. at 338. Of course, whether Cassie actually lived with—and did not merely visit—her mother is the very point in dispute. Some of the statements made by Cassie about her trips to her mother's home seem consistent with visitor status. Her testimony establishes that she did not stay with her mother for extended stretches. Cassie testified that she "saw her [mother] a couple of times a week" and that her trips sometimes involved overnight stays but sometimes not.

---

[2] Farm Bureau has not argued to this Court that the policy issued to Cassie's mother and stepfather excludes the possibility of dual residency. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

Moreover, even if Cassie stayed with her mother on "more than merely a temporary basis," other parts of her testimony appear to cast doubt on whether she and her mother "intended to form a common household." *Martin*, 376 N.C. at 292. When asked for her address at the outset of her testimony, Cassie gave her father's address and said nothing about living with her mother. She went on to testify that she had lived alone with her father for the fifteen-year period immediately preceding her accident. Cassie also stated that she depended on her father for financial support but did not claim to receive such aid from her mother.[3] Cassie testified that all her mail went to her father's address and that she treated her father's address as her home address for car title, property tax, and voter registration purposes. Despite her twice-weekly trips to her mother's home, Cassie said that she only occasionally kept clothes there. Taken as a whole and viewed in the light most favorable to Farm Bureau, this testimony would allow a jury to find that Cassie "is part of her father's household and merely visits her mother." *Herring*, 284 N.C. at 343 (Dillon, J., dissenting).

Defendants' affidavits do not overcome the hurdles to summary judgment erected by Cassie's testimony. To the contrary, as remarked by the dissenting judge in the Court of Appeals, they raise credibility issues that must be resolved by a jury at trial and not by a trial court at summary judgment. *Id.* at 341–42; *see also City of*

---

[3] Cassie did testify that she was on her mother's cellular phone plan, but she did not provide any details regarding the cost to her mother of having Cassie on the plan.

*Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 655 (1980) ("[I]f there is any question as to the credibility of affiants in a summary judgment motion or if there is a question which can be resolved only by the weight of the evidence, summary judgment should be denied.").

This Court has outlined the circumstances in which a trial court may grant summary judgment to a moving party based on that party's own affidavits.

> [S]ummary judgment may be granted for a party with the burden of proof on the basis of his own affidavits (1) when there are only latent doubts as to the affiant's credibility; (2) when the opposing party has failed to introduce any materials supporting his opposition, failed to point to specific areas of impeachment and contradiction . . . ; and (3) when summary judgment is otherwise appropriate. This is not a holding that the trial court is required to assign credibility to a party's affidavits merely because they are uncontradicted. To be entitled to summary judgment the movant must still . . . show that there are no genuine issues of fact . . . . Further, if the affidavits seem inherently incredible; if the circumstances themselves are suspect; or if the need for cross-examination appears, the court is free to deny the summary judgment motion. *Needless to say, the party with the burden of proof, who moves for summary judgment supported only by his own affidavits, will ordinarily not be able to meet these requirements and thus will not be entitled to summary judgment.*

*Kidd v. Early*, 289 N.C. 343, 370–71 (1976) (emphasis added).

Here the affidavits submitted by defendants conflict with Cassie's testimony on key points, raising more than latent doubts regarding defendants' credibility. For instance, all four affidavits aver that Cassie "routinely" received mail at her mother's home. Yet, in her testimony Cassie more than once maintained without exception

that her mail went to her father's address, and she expressly denied receiving any mail whatsoever at her mother's address in 2019, the year of her accident. Additionally, in her affidavit Cassie swears that she received financial support from both her father and her mother. When asked during her testimony whether her parents supported her financially, however, Cassie stated that she depended on her father for financial assistance but that her mother was on disability. Because the task of resolving such factual discrepancies lies with the jury, the trial court should have denied defendants' motion for summary judgment.

The evidence in the record raises genuine issues of material fact as to whether Cassie qualifies as a resident of her mother's household under the two-part test articulated by this Court in *Martin*. Accordingly, we reverse the decision of the Court of Appeals affirming summary judgment for defendants and remand this case for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice EARLS dissenting.

The law of this State, as established by the General Assembly in the North Carolina Motor Vehicle Safety-Responsibility Act of 1953, N.C.G.S. §§ 20-279.1 to 279.39 (2021), "is to compensate innocent victims of financially irresponsible motorists." *Sutton v. Aetna Cas. & Sur. Co.*, 325 N.C. 259, 266 (1989). That purpose "is best served when the statute is interpreted to provide the innocent victim with the fullest possible protection." *Proctor v. N.C. Farm Bureau Mut. Ins. Co.*, 324 N.C. 221, 225 (1989); *see also Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 574 (2002) (same). It is also the intent of the General Assembly "that insurance policies and contracts be readable by a person of average intelligence, experience, and education." N.C.G.S. § 58-38-5 (2021). In this case, Ms. Herring's mother and stepfather purchased an underinsured motorist policy and listed Ms. Herring as an insured driver, and they had every reason to believe from the plain language of the policy that as a part-time resident of their household, Ms. Herring's injuries would be compensated if she was an innocent victim of a financially irresponsible motorist. The undisputed evidence, taken in the light most favorable to N.C. Farm Bureau, shows that Ms. Herring was a resident of her mother's household and that she is therefore entitled to summary judgment in this action.

This case asks us to determine if the trial court properly granted summary judgment in favor of Ms. Herring on the issue of whether she is a "resident" of her

mother's home under her mother and stepfather's underinsured motorist policy. I agree with the majority that our law evinces a preference for extending insurance coverage, and accordingly the term "resident" encompasses a "variety of living arrangements." Included within the term "resident" are adult children like Ms. Herring, who depend on their parents for financial and emotional support. While it is true that under our precedent a person who has not lived with an insured relative "in the same dwelling . . . for a meaningful period of time" is not considered a resident of that home, *N.C. Farm Bureau Mut. Ins. Co. v. Martin*, 376 N.C. 280, 291 (2020), the four months that Ms. Herring stays with her mother each year is sufficient to meet this standard, particularly when the evidence shows that her mother intended to form a common household with her, *see id.* at 292. There are adult children who, for a variety of reasons, may depend heavily on their parents. The fact that such an adult child's parents are divorced, live in different households, and yet share responsibilities for caring for that adult child does not invalidate the child's residency in those homes. *See id.* Thus "[t]he material question of fact in this case is not whether the mother's home is [Ms. Herring's] *primary* residence; rather, it is whether [Ms. Herring] maintains *multiple* residences." *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 284 N.C. App. 334, 339 (2022).

Accordingly, I disagree with the majority's holding that summary judgment in favor of Ms. Herring was erroneous. Instead, I would affirm the decision of the Court of Appeals and instruct that court to reinstate the trial court's order granting

summary judgment in favor of Ms. Herring.

On 19 April 2019, Ms. Herring and her father, Franklin Herring, were involved in a car accident while traveling down Wendell Boulevard in Wendell, North Carolina. Ms. Herring's father was operating the vehicle when Debbie Perry, who failed to yield the right of way, crashed into Ms. Herring and her father. As a result of the accident, Ms. Herring suffered multiple injuries including, rib fractures, a crushed kneecap, facial injuries, and jaw injuries. Due to her injuries, Ms. Herring required major surgery and hospitalization. Ms. Perry's insurance policy, issued by North Carolina Farm Bureau Insurance Company (Farm Bureau), provided Ms. Perry with $300,000 coverage per accident, and $100,000 coverage per person. Pursuant to Ms. Perry's policy, Farm Bureau paid Ms. Herring the $100,000 policy limit.

However, because Ms. Herring's injuries were substantial, Ms. Perry's $100,000 per person policy limit was inadequate, and Ms. Herring pursued additional compensation through both of her parents' underinsured motorist policies. The policy at issue here is an underinsured motorist policy issued by Farm Bureau and maintained by Ms. Herring's mother, Ruth Herring, and her stepfather, Curtis Lee Turman. Ms. Herring is listed as an insured driver on this policy, and in May 2020, she filed a lawsuit to recover under the policy's benefits. The parties agreed to arbitration, and in August 2020, the trial court stayed the lawsuit to allow the parties to participate in an arbitration hearing. On 23 November 2020, at Farm Bureau's

request, Ms. Herring sat for an "Examination Under Oath." During this proceeding, she was asked about her home address, where she lived, and the fact that most of her documents, including her medical records, bank statements, and drivers' license only referenced her father's address.

In order to qualify for coverage pursuant to her mother and stepfather's policy, Ms. Herring must satisfy two requirements: (1) she must be the family member of a named insured related by blood, marriage, or adoption; and (2) she must be a "resident" of the insured's household. While the phrase "family member" is defined in the policy, and Ms. Herring's classification as a family member is not disputed, the term "resident" is not defined in the policy and is the center of this dispute.

Ms. Herring contends that she is a resident of both her mother's home and her father's home and accordingly she is a "resident" of her mother's home pursuant to Farm Bureau's insurance policy. The record supports Ms. Herring's position and shows that while Ms. Herring is an adult and was thirty-three years old at the time of the crash, she has maintained residency in both homes due to being diagnosed with anxiety and depression, which has required medication management and inpatient and outpatient treatment. Ms. Herring's symptoms have also prevented her from maintaining employment and owning her own home. Due to the impact Ms. Herring's symptoms have on her daily life activities, she has relied on her parents' support since she was first diagnosed at age seventeen. In connection with her mental health diagnoses, Ms. Herring also depends on both of her parents for emotional comfort and

financial support. Because neither parent can provide for Ms. Herring's financial support exclusively, particularly because her mother's primary source of income is derived from disability payments, both of her parents' households have shared this responsibility.

Moreover, Ms. Herring maintains a permanent room at both homes and keeps personal belongings at each residence. These belongings include toiletries, bedding, and clothing. Evidence from Ms. Herring's Examination Under Oath also showed that she has lived "between" her mother's and father's homes and that she spends "a couple of [days] a week" with her mother, which is a schedule she has "always" kept. There, Ms. Herring also noted that she stays the night at her mother's home "a lot," which she quantified as "[p]robably four months out of the year."

In response, Farm Bureau asserts that Ms. Herring is not a resident of her mother's home because: (1) her mother does not support her financially; (2) she receives her mail at her father's home; (3) she is registered to vote in Johnston County, where her father lives; (4) her doctor and dentist are located in Zebulon, North Carolina, near her father's home; and (5) her vehicle registration uses her father's address. However, none of this information invalidates or contradicts Ms. Herring's position that she is a resident of two homes, her father's and her mother's. While there are some legal purposes for which an individual must designate a primary residence under our precedent, residency for purposes of insurance is not one of those.

The record shows that Ms. Herring receives mail at both her mother's and father's homes. Because Ms. Herring resides with her mother approximately four months out of the year and with her father approximately eight months out of the year, it is simply logical that she would not only receive mail at both residences,[1] but also that she would register to vote in the county where her father's home is located, register her vehicle using her father's home address, and visit medical professionals near her father's home. Furthermore, Ms. Herring's statement that her mother is "on disability" cannot be reasonably interpreted to mean that her mother does not provide her with financial support. After all, providing a child, adult or otherwise, with a roof over their head for four months out of the year is a form of financial support. Also, there is evidence that Ms. Herring's mother pays her phone bill. Indeed, Ms. Herring's mother and stepfather have her listed as a driver on their insurance policy and are thus financially supporting her by paying that bill.

As noted above, the question of material fact in this case is whether Ms. Herring maintains multiple residences, and not whether Ms. Herring's mother's residence is her primary home. Because the evidence here conclusively demonstrates that Ms. Herring held multiple residences at the time of her car accident, namely at her mother's and father's homes, summary judgment in favor of Ms. Herring was appropriate. Thus, I would affirm the Court of Appeals' decision and instruct that

---

[1] Additionally, at oral argument counsel for Farm Bureau conceded that Farm Bureau sent a $5,000 check for medical benefits in connection with Ms. Herring's claim under her mother's underinsured motorist policy to her mother's address.

court to reinstate the trial court's order granting summary judgment for Ms. Herring.

Justice RIGGS joins in this dissenting opinion.